[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10901
_____

D.C. Docket  No. 0:09-cv-60637-PCH


SUNBEAM TELEVISION CORP.,

Plaintiff - Appellant,

versus


NIELSEN MEDIA RESEARCH, INC.,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 4, 2013)

Before DUBINA, Chief Judge, PRYOR, and HILL, Circuit Judges.

HILL, Circuit Judge:

Plaintiff/appellant Sunbeam Television Corporation (Sunbeam) appeals the district court's judgment granting partial summary judgment in favor of defendant/appellee Nielsen Media Research, Inc. (Nielsen), dismissing Sunbeam's antitrust claims under Section Two of the Sherman Act, 15 U.S.C. § 2, and the Florida Antitrust Act (FAA), Fla. Stat. § 542.19, for treble damages under Section Four of the Clayton Act, 15 U.S.C. § 15.[1]  The district court held that Sunbeam lacked antitrust standing to assert its Sherman Act and FAA claims against Nielsen.  We affirm the judgment of the district court.

## I.  FACTUAL BACKGROUND

Neither party disputes that Nielsen exercises monopoly power over the television audience measurement services industry, both nationally, for the United States as a whole, and for 210 local markets.[2]  The accurate measurement of a television viewing audience translates into "ratings," or the number of households

---

[1]  The district court reserved ruling on Sunbeam's remaining two claims under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204, and contract common law. Sunbeam was unwilling to proceed to trial on these claims, and stipulated to their dismissal with prejudice.

[2]  Since the 1950's, Nielsen has been the predominant supplier of television audience measurement services in the United States.  Since 1993, when competitor, Arbitron, Inc. (Arbitron), exited the television audience measurement market, Nielsen effectively has been the sole provider of such services in the United States.

tuned in and the number and types of viewers watching a particular television station at a given time or a given program.[3]

Ratings are the gold standard of television media. They provide the percentage of all possible viewers of a particular demographic group watching a particular program or station. Ratings drive both the price point of a television commercial, a broadcaster's primary source of revenue, and the television station's going concern value.[4]

For purposes of this appeal, the pertinent local market is the Miami-Fort Lauderdale area. Sunbeam is one of Nielsen's customers in that local market, and uses Nielsen's ratings in operating WSVN, the FOX-affiliated broadcast television channel in Miami. Sunbeam has purchased ratings from Nielsen for over thirty years.

Naturally, the technology and methodology that Nielsen has employed to collect raw viewership sampling data, from which it extrapolates ratings, has

---

[3] Nielsen provides its services and ratings information pursuant to non-exclusive licenses, by subscriptions of varying lengths. Its customers include television broadcast stations, cable television operators, advertising agencies, among others. Nothing in Nielsen's non-exclusive licenses prevent customers from simultaneously purchasing a second ratings service. For example, between 1978 and 1989, when Arbitron provided local television ratings services in competition with Nielsen, between 60-80% of customers purchased both.

[4] The record indicates that the television advertising industry is an estimated $60 to $70 billion business.

3

changed over time.  At first, Nielsen used a paper Diary Method.  It required

selected sample viewers manually to record (in handwritten diary form) their

demographic information, together with the television programs they watched over

the course of a week.[5]  This hand recording was often based upon a viewer's

recollection, days after a program was viewed.

Next, Nielsen introduced the Meter-Diary Method.  This new technology

combined the existing paper Diary Method (in place in certain sample homes),

with information generated by electronic meters (installed in other selected

homes).  The new meters automatically recorded the channels to which a viewer's

television set was tuned.

The latest technology presented by Nielsen is the Local People Meter

(LPM) Method.  The LPM Method eliminates the manual paper Diary Method

entirely.  It combines an electronic meter, which tracks household viewership in

general, with a remote control device.  The LPM Method is interactive; it requires

the individual household viewer to press unique identifying buttons on the

handheld remote control provided with the meter.[6]  It enables Nielsen to determine

---

[5] Ratings are derived during the critical viewing times which are four to seven designated one-week "sweeps" periods each year.

[6] Nielsen claims that the LPM Method reduces response error by contemporaneously recording each individual's viewing behavior.  It also eliminates processing errors caused by merging the two sets of data used in the Meter Diary Method.

which family member is viewing a particular television program at a particular time.  Nielsen has used this LPM technology for its national ratings since 1987.

In 2008, Nielsen replaced the Meter-Diary Method in Miami-Fort Lauderdale with the LPM Method.[7]  Sunbeam's antitrust claims principally arise from Nielsen's alleged improper and defective implementation of this new ratings technology.  Sunbeam alleges that Nielsen's switch to LPMs in audience measurement equipment caused an immediate and profound approximate 50% drop in Sunbeam's broadcast television station's (WSVN) ratings.[8]  In monetary terms, WSVN lost approximately $1 million per month in advertising revenue.  Its going-concern value dropped by over $100 million.

Sunbeam alleges that Nielsen's new LPM Method is flawed and inferior to the old Meter-Diary Method.  It claims that the LPM Method dramatically understates WSVN's actual viewership audience.[9]  However, the record reflects,

---

Sunbeam claims that the LPM remote control imposes extraordinary compliance burdens on an individual household member, causing skewed results.

[7] The LPM Method was first introduced in local markets by Nielsen six years earlier, in 2002, in some of its larger cities, including Boston, New York, Los Angeles, Chicago, and San Francisco, in 2004.  By 2008, Miami was the sixteenth market to use the LPM Method.

[8] Sunbeam also owns two television stations in Boston.  There is no evidence in the record that Sunbeam is dissatisfied with its LPM ratings in that local market.

[9] There is record evidence to indicate that, when the LPM Method was first introduced in 2002, in the other fifteen local markets, their ratings also dropped initially as well.

5

and the district court found, that none of Sunbeam's fact witnesses or expert witnesses could categorically state that the new product was inferior to the old.[10] Nothing in the evidence indicates that the new system produced less accurate ratings than the old.

## II. PROCEDURAL HISTORY

In its second amended complaint, Sunbeam contends that it has been injured, not just by Nielsen's introduction of an inferior product with respect to Sunbeam's local market area, but by Nielsen's violations of the antitrust laws, through its exclusionary conduct in its willful pursuit of remaining a monopolist. Sunbeam claims that "[b]ut for Nielsen's exclusionary conduct, competitors likely would have entered or would enter the Relevant Market [the Miami-Fort Lauderdale area]." Sunbeam argues that these antitrust violations insulate Nielsen from competition, allow it to force inferior products upon its customers, and force its customers to pay supracompetitive prices.[11]

---

[10] The district court found that Sunbeam had "not adduced competent evidence to permit a jury to find that as a general matter, [LPMs] are inferior to the Meter-Diary system."

[11] With particularity, Sunbeam alleges that the exclusionary acts that have enabled Nielsen to maintain its monopoly position include that: (1) it mandated contract provisions that prevented competitors from entering the market; (2) it undertook transactions and business strategies intended to neutralize actual or potential competitors; (3) it imposed punitive pricing on customers who resisted its practices; (4) it utilized defective ratings data to attract and retain new cable customers, thereby foreclosing a potential avenue of competitor entry; (5) it imposed on its customers onerous contract provisions that left them with no effective contractual recourse in the event of breach; and (6) it charged non-competitive prices for its rating services.

Before filing its second amended complaint, the district court instructed Sunbeam to establish in its pleadings that there were potential competitors "willing and able to supply a superior product but for Nielsen's exclusionary conduct." For purposes of this appeal, Sunbeam alleged that there were three potential competitors excluded from the market by Nielsen's anticompetitive behavior: Arbitron, Inc. (Arbitron), ADcom Information Services Company (ADcom), and erinMedia, LLC (erinMedia).

Sunbeam contends that Arbitron was both willing and able to enter the local television ratings market. Arbitron and Nielsen had competed in the local television ratings business for many years before Arbitron voluntarily left the industry in 1993, to focus on the radio ratings market. It is currently the leading provider of radio audience measurement services in the United States.

Next, Sunbeam alleges that ADcom was willing and able to enter the local television market. ADcom was a ratings company that focused on measuring data from cable television customers.

Lastly, Sunbeam alleged that erinMedia was both willing and able to enter the local television ratings market. Its business model measured television ratings

7

by gathering set top box information for cable companies.[12]

Subsequently, Nielsen moved for summary judgment.  Nielsen, claims, in essence, that this is not an antitrust case.  It argues that Sunbeam doesn't want a new provider of television audience measurement services, but that it just wants its old ratings back.  Nielsen argues that "[c]hanges in ratings methodologies produce changes in ratings," and that the customers that complain about LPMs, are the customers whose ratings go down.

After hearing, the district court concluded that Sunbeam had failed to raise an issue of material fact as to whether any of these three potential competitors it suggested was willing and able to provide a local television ratings service that could have substituted for Nielsen's service in Miami.  It granted partial summary judgment in favor of Nielsen and dismissed Sunbeam's antitrust claims, on the basis that Sunbeam lacked antitrust standing to pursue its case.[13]  This appeal ensued.

### III.  ISSUES

We consider three issues on appeal:

---

[12] Although Nielsen moved to dismiss the second amended complaint, the district court denied the motion on the grounds that the existence of potential competitors had been sufficiently pled.

[13] *See* note 1 *supra*.

A.  Whether Sunbeam has standing to sue Nielsen under Section Two of the Sherman Act and the FAA;

B.  Whether, to establish antitrust standing, Sunbeam, as one of Nielsen's customers, must establish the existence of a willing and able competitor that would have entered the relevant market and competed with Nielsen, but for Nielsen's exclusionary conduct; and

C.  Whether, if Sunbeam does have antitrust standing, has it raised a genuine issue of material fact as to whether Nielsen engaged in unlawful exclusionary conduct in the television audience measurement industry, causing antitrust injury to Sunbeam.

## IV.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We review *de novo* the district court's [partial] grant of summary judgment, and apply the same legal standards as the district court and view all facts and reasonable inferences in the light most favorable to the non-moving party.  *Gentry v. Harborage Cottages-Stuart, LLLP, et al.*, 654 F.3d 1247, 1255 (11th Cir. 2011) (citation omitted).  We review issues of antitrust standing *de novo*.  *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291,

9

1298 (11th Cir. 2010), citing *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997).

## V.  DISCUSSION

### A.  *Antitrust Standing - In General*

A private plaintiff seeking damages under the antitrust laws must establish standing to sue.  *Fla. Seed Co.*, 105 F.3d at 1374.  Antitrust standing requires that a party must do more than meet the basic "case or controversy" or "injury in fact" required by Article III of the Constitution.  *Id.,* citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991).  The doctrine of antitrust standing reflects prudential concerns and is designed to avoid burdening the courts with speculative or remote claims.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 103 S.Ct. 897, 912 (1983).  Antitrust standing is a conscientious method to find the proper private plaintiff to enforce the antitrust laws.  *Todorov*, 921 F.2d at 1448.[14]

### B.  *Antitrust Standing - Treble Damages*

Section Four of the Clayton Act creates a private right of action for ". . . any

---

[14] This is a judicial balancing act.  Public policy encourages private enforcement, as government resources are inherently limited, and private parties are usually most directly affected by the [exclusionary] conduct.  Bauer, The Stealth Assault on Antitrust Enforcement: Raising the Barriers for Antitrust Injury and Standing, 62 U. Pitt. L. Rev. 437, 438 (2001).

person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . , and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a).[15]  In order to recover treble damages, Section Four requires that a private plaintiff enforcing the antitrust laws must establish both:  (1) that the plaintiff has standing; and, (2) that the defendant has violated the antitrust laws.  *See Levine v. Cent. Fl. Med. Affiliates*, 72 F.3d 1538, 1545 (11th Cir. 1996).

Antitrust standing, however, is narrower than the broad language of the statute indicates.  *Associated Gen. Contractors*, 103 S.Ct. at 907.  The Supreme Court acknowledged that a number of "labels" suggested by the federal appeals courts, in an attempt to more precisely define antitrust standing, "may lead to contradictory and inconsistent results . . . In our view, courts should analyze each situation in light of the factors set forth in the text [of *Associated General*]."  *Id.* at 908 n.33.  The Supreme Court declined to articulate a bright-line rule as to antitrust standing and injury.  *Id*. at 907-08.  Instead it encouraged courts to

---

[15] In its brief, Sunbeam never cites this statutory mechanism upon which it bases its treble damages claim.  It relies, instead, upon cases under Section Two of the Sherman Act, 15 U.S.C. § 2.  That reliance alone, is not enough to establish civil liability for a private plaintiff.  *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir. 1987) (where "[a]n antitrust plaintiff must show that he has been damaged and that the antitrust violation alleged is the cause of his injury").  The "business or property" requirement of Section Four of the Clayton Act helps prevent "entirely remote or speculative claims."  *Palmyra Park, Hosp., Inc.*, 604 F.3d at 1298.

employ a broad balancing analysis that "requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.*

Standing analysis involves consideration of the nexus between the antitrust violation and the plaintiff's harm and whether the harm alleged is of the type for which Congress provides a remedy. *Cargill, Inc. v. Monfort of Colo., Inc.*, 107 S.Ct. 484, 489 (1986). Although a showing of antitrust injury is necessary, it is "not always sufficient . . . to establish standing under [section] 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under [section] 4 for other reasons." *Id.* at 489 n.5.

This circuit employs a two-prong test for antitrust standing under Section Four of the Clayton Act. *Palmyra Park Hosp., Inc.*, 604 F.3d at 1299. First, the plaintiff must establish that it has suffered an antitrust injury. *Id.,* citing *Todorov*, 921 F.2d at 1449.[16] Second, the plaintiff must be an "efficient enforcer" of the antitrust laws. *Id.*; *Fla. Seed Co.*, 105 F.3d at 1374; *Mun. Utils. Bd. of Albertville*

---

[16] To have standing, antitrust plaintiffs "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 97 S.Ct. 690, 697 (1977). This requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to prevent. *See Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389-90 (11th Cir. 1990).

12

*v. Ala. Power co.*, 934 F.2d 1493, 1499 (11th Cir. 1991).  The factors to be considered in determining whether a plaintiff is an efficient enforcer are:  (1) the directness or indirectness of the asserted injury; (2) the remoteness of the injury; (3) whether other potential plaintiffs were better suited to vindicate the harm; (4) whether the damages were highly speculative; (5) the extent which the apportionment of damages was highly complex and would risk duplicative recoveries; and (6) whether the plaintiff would be able to efficiently and effectively enforce the judgment.  *Associated Gen. Contractors*, 103 S.Ct. at 908-12; *Todorov*, 921 F.2d at 1451-52 (where other factors might also be relevant as these factors are often intertwined, with no single predominate factor).

### 1.  *The First Prong - Antitrust Injury*

In this appeal, Sunbeam alleges that Nielsen violated the antitrust laws by willfully maintaining its monopoly power through exclusionary behavior that caused Sunbeam to suffer antitrust injury.  Sunbeam contends that by insulating itself from competition, Nielsen was free to charge supracompetitive prices, force inferior LPM products upon its customers, and prevent would-be competitors from entering the market with superior products.  Nielsen's inferior product underestimated Sunbeam's actual viewership audience and caused Sunbeam antitrust injury, by dramatically diminishing its advertising revenue and the going-

13

concern value of WSVN.  Sunbeam claims that these injuries are all "[i]njuries of the type the antitrust laws were intended to prevent."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 97 S.Ct. 690, 697 (1977).

Here the district court did not address whether Sunbeam suffered an antitrust injury under the first prong of antitrust standing.  It chose to begin with the second prong, efficient enforcer.  *Palmyra Park*, 604 F.3d at 1299.

2.  *The Second Prong - Efficient Enforcer*

In order to determine whether Sunbeam was an efficient enforcer for purposes of antitrust standing, the district court began by focusing upon whether or not Sunbeam had demonstrated "a causal relationship between the antitrust violation alleged and the antitrust injury sustained."  It sought to determine whether Sunbeam's alleged injuries were direct or remote, whether the illegal conduct alleged materially contributed to the injury, and whether its damages were speculative or not.  *Associated Gen. Contractors*, 103 S.Ct. at 908-12; *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561 (11th Cir. 1987); *see also Palmyra Park*, 604 F.3d at 1304; *Todorov*, 921 F.2d at 1448; *McClure v. Undersea Indus., Inc.*, 671 F.2d 1287, 1289 (11th Cir. 1982).

Naturally the parties differ on the proof required to prove the causation element.  Sunbeam vigorously argues that, because it is one of Nielsen's

14

*customers*, and not one of Nielsen's *competitors*, its burden of proof is much less.

Nielsen argues that there is no difference in the burden of proof required to prove

causation, whether it is a customer case or a competitor case.

Finding no precedent directly on point in this circuit as to customer cases,

the district court relied upon and adopted the standard set forth by the District of

Columbia Circuit in *Meijer, Inc. v. Biovail, Corp.*, 533 F.3d 857 (D.C. Cir. 2008).

The district court stated that to bring this controversy within the ambit of antitrust,

in order to establish a causal nexus between Nielsen's alleged exclusionary

conduct and Sunbeam's perceived antitrust injury, " Sunbeam must sufficiently

establish that there existed a television viewership ratings firm willing and able to

supply a superior product but for Nielsen's exclusionary conduct."

The district court stated, quoting from *Meijer*:

> Just as a would-be entrant suing an incumbent firm for excluding it
> from a relevant market in violation of the Sherman Act must
> demonstrate it intended and was prepared to enter that market . . . , so
> a would-be *purchaser* [customer] suing an incumbent monopolist for
> excluding a potential competitor from which it might have bought a
> product at a lower price must prove the excluded firm was willing and
> able to supply it but for the incumbent firm's exclusionary conduct.

*Meijer*, 533 F.3d at 862.[17]  (Emphasis added).

---

[17] In *Meijer*, pharmaceutical customers brought an antitrust lawsuit against the drug's
manufacturer, alleging that it engaged in bad faith litigation to unlawfully preclude a different

15

To demonstrate that a potential competitor had the intent and was prepared to enter the audience measurement ratings market, but for Nielsen's exclusionary conduct, Sunbeam must have established that the potential competitor has "take[n] some affirmative steps to enter the business." *Gas Utils. Co. of Ala., Inc. v. So.Natural Gas Co., 996 F.2d 282, 283 (11ᵗʰ Cir. 1993)*; *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991). The preparedness requirement is particularly important for "capital intensive" industries. *Cable Holdings*, 825 F.2d at 1563. To prove preparedness, a plaintiff must show that the potential competitor "prepared cash flow estimates and financial statements in order to determine the profitability of the expansion," had existing capabilities that would have allowed it to serve the market, took affirmative steps to obtain necessary government permits, etc. *Id.* at 1562.

Sunbeam strenuously argues throughout that proof of a "willing and able" competitor "standing in the wings, ready to swoop in" should only apply to *competitor* plaintiffs, not *customer* plaintiffs. We disagree. Although an issue of first impression in this circuit, we are persuaded by the standard set forth by the

---

drug manufacturer from marketing a generic version of the same drug. *Id.* at 860-61. On summary judgment, the D.C. Circuit held that the customer plaintiffs lacked antitrust standing as they could not prove that, but for the original drug manufacturer's exclusionary conduct, the generic drug manufacturer would have obtained FDA approval. *Id.*

16

District of Columbia circuit in *Meijer*, and adopted by the district court in this appeal.

Whether or not the plaintiff is a customer or a competitor, in order to meet the second prong, the plaintiff must prove the existence of a competitor willing and able to enter the relevant market, but for the exclusionary conduct of the incumbent monopolist. *Id., see e.g., Cable Holdings*, 825 F.2d at 1562; *Gas Utils.*, 996 F.2d at 283; *Thompson*, 934 F.2d at 1572 n.3 (for dicta that the intent and preparedness test can apply to non-competitor private plaintiffs also, such as, a customer).

The district court examined in great detail and at great length the three candidates suggested by Sunbeam as excluded potential competitors:  Arbitron, ADcom, and erinMedia.  It found that none of the three were willing and able to enter the capital intensive television audience measurement industry and compete against Nielsen.[18]  *Meijer*, 533 F.3d at 862.  The district court concluded that Sunbeam had not presented "a disputed factual issue in regard to the existence of a willing and able competitor that would have entered the relevant market but for Nielsen's exclusionary practices."

---

[18] Each of these three companies, as potential willing and able competitors to Nielsen, were thoroughly examined and thoroughly analyzed by the district court in its opinion.  There is no need for us to repeat that discussion here.

17

On this basis, the district court found that Sunbeam lacked antitrust standing to pursue its case, as it failed to meet the second prong requirement as an efficient enforcer, and granted partial summary judgment to Nielsen. *Id.* We agree with the judgment of the district court.

## VI.  CONCLUSION

The district court correctly held that Sunbeam lacked antitrust standing to pursue this lawsuit as it failed to establish that it was an efficient enforcer of the antitrust laws.  Without antitrust standing, we do not reach the other issue on appeal.  The judgment of the district court granting partial summary judgment to Nielsen is

AFFIRMED.