RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE,
                                            *Plaintiff*,


UNITED BIOLOGICS, LLC, dba United Allergy Services
                                    *Plaintiff-Appellant*,                    ⎤
                                                                                ⎥   No. 24-5153
                                                                                ⎥
        *v.*                                                                   ⎥


AMERIGROUP  TENNESSEE,  INC.,  dba  Amerigroup
Community Care; PHYSICIANS' MEDICAL ENTERPRISES,
LLC,  dba  PME  Communications,  LLC;  ALLERGY
ASSOCIATES, P.A., dba Allergy, Asthma and Sinus
Center, P.C.; NED DELOZIER,
                                    *Defendants - Appellees*.

───────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:19-cv-00180—Travis Randall McDonough, District Judge.

Argued:  February 5, 2025

Decided and Filed:  October 10, 2025

Before:  SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Paul D. Clement, CLEMENT & MURPHY, PLLC, Alexandria, Virginia, Casey
Low, PILLSBURY WINTHROP SHAW PITTMAN LLP, Austin, Texas, for Appellant.
William J. Sheridan, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellee Amerigroup
Tennessee, Inc.   John E. Winters, KRAMER RAYSON LLP, Knoxville, Tennessee, for
Appellees Physicians' Medical Enterprises LLC, Allergy Associates P.A., and Ned DeLozier.
**ON BRIEF:**  Paul D. Clement, Matthew D. Rowen, James Y. Xi, CLEMENT & MURPHY,
PLLC, Alexandria, Virginia, Casey Low, Dillon J. Ferguson, Michael H. Borofsky, Sarah Goetz,
PILLSBURY WINTHROP SHAW PITTMAN LLP, Austin, Texas, for Appellant.  William J.
Sheridan, REED SMITH LLP, Pittsburgh, Pennsylvania, Raymond A. Cardozo, REED SMITH

LLP, San Francisco, California, for Appellee Amerigroup Tennessee, Inc.  John E. Winters, Bryce E. Fitzgerald, KRAMER RAYSON LLP, Knoxville, Tennessee, for Appellees Physicians' Medical Enterprises LLC, Allergy Associates P.A., and Ned DeLozier.

MURPHY, J., delivered the opinion of the court in which SUTTON, C.J., and KETHLEDGE, J., concurred.  KETHLEDGE, J. (pp. 42–43), delivered a separate concurring opinion.

————————————

**OPINION**

————————————

MURPHY, Circuit Judge.  The plaintiff in this case—which we will call "United Allergy"—provides personnel and supplies to primary-care physicians so that the physicians may offer allergy testing and immunotherapy to patients.  United Allergy charges the physicians a set fee for its goods and services, and the physicians, in turn, charge medical insurers for their own allergy care.  According to United Allergy, though, several insurers conspired with each other and with the predominant allergy-care medical group to drive United Allergy and its contracting physicians from the market.  United Allergy brought two antitrust claims against the insurers and medical group.  Yet the antitrust laws permit plaintiffs to sue only if they have suffered injuries "by reason of" an antitrust violation.  15 U.S.C. § 15(a).  And the district court dismissed United Allergy's antitrust claims on the pleadings because it lacked "standing" to invoke this provision.  The court then rejected United Allergy's state-law claims at the summary-judgment stage.

We agree with the district court's results.  In the process, though, we must clarify the nature of the antitrust inquiry.  To sue under the antitrust laws, a plaintiff must show both that it suffered an antitrust injury and that the defendant proximately caused the injury.  United Allergy's suit flunks the latter element.  Relying on proximate-causation principles, the Supreme Court has held "that *indirect* purchasers who are two or more steps removed from [an antitrust] violator in a distribution chain may not sue."  *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019).  And the same rule should apply in reverse to *indirect sellers* for antitrust violations that a group of buyers (like the insurers here) commit.  United Allergy is also an indirect seller because it is "two" "steps removed from" the insurers in the distribution chain.  *Id.*  The insurers directly

bought from (and harmed) the primary-care physicians by allegedly conspiring to fix their reimbursement rates and deny their claims. And that conduct harmed United Allergy only indirectly because it led the physicians not to pay United Allergy's fees and to end their relationship. We thus affirm.

I

The district court dismissed this case in part at the pleading stage and in part at the summary-judgment stage. When considering the claims that the district court rejected at the pleading stage, we must rely on the factual allegations in United Allergy's complaint. *See Blackwell v. Nocerini*, 123 F.4th 479, 482 (6th Cir. 2024). And when considering the claims that the district court rejected on summary judgment, we must rely on the facts that United Allergy has supported with evidence. *See Gambrel v. Knox County*, 25 F.4th 391, 400 (6th Cir. 2022). To describe the facts, then, we rely primarily on the complaint while adding some supplemental (undisputed) information from the record.

A

Allergies affect millions of Americans. Some 30 to 40% of the population suffers from seasonal hay fever (or "allergic rhinitis") every spring and fall. Compl., R.103, PageID 2668. This case concerns the medical *services* that treat allergies, the medical *suppliers* who provide these services, and the third-party *payors* who pay for them on behalf of patients.

*Services*. To test for allergies, providers can perform "a skin prick test" on a patient or send the patient to a lab for "an allergy blood test." *Id.*, PageID 2671. The first test requires a "technician" to prick the patient's skin with allergens and measure the reactions. *Id.*, PageID 2674. Doctors then interpret the results to decide whether a patient tested positive. *Id.* To make this decision, they may also rely on a "physical examination" and the "patient's clinical history." *Id.*

Many people use over-the-counter or prescription drugs to treat their allergies. *Id.*, PageID 2673. But these drugs simply "mask" the symptoms and do not remedy the "underlying cause" (at least for seasonal allergies). *Id.* Only one treatment—immunotherapy—can "cure"

these allergies. *Id.*, PageID 2671. Immunotherapy "introduc[es] allergens incrementally into the patient's system to desensitize the patient to [those] allergens." *Id.*

Doctors can prescribe immunotherapy only if testing has confirmed a patient's allergy. *Id.*, PageID 2674. Before doing so, they must consider immunotherapy's risks and benefits based on each patient's unique needs. *Id.* When patients choose the therapy, technicians will combine and dilute FDA-approved vials of antigens into proper doses for them. *Id.*, PageID 2674–75. Doctors must supervise these technicians. *Id.* They or the technicians will administer the immunotherapy through "subcutaneous" or "allergy" shots. *Id.*, PageID 2675. Some patients may receive the shots "2 to 3 times per week for several years" in a doctor's office. *Id.*, PageID 2676. Because patients must make frequent trips to a doctor's office, they typically want treatment "close to their homes or workplaces." *Id.* And "a majority of physicians" permit patients to self-administer the shots at home "in appropriate cases." *Id.*, PageID 2675.

*Suppliers*. Doctors who specialize in this area—called "allergists"—provide the main supply of allergy testing and immunotherapy in Tennessee. *Id.*, PageID 2669. To become an allergist, a doctor must "complete[] a fellowship" with the American Board of Allergy and Immunology. *Id.* And one corporation—the Allergy, Asthma and Sinus Center, P.C. or "the Center" for short—dominates the Tennessee market. *Id.*, PageID 2668–70. Its allergists conduct about "70% of the allergy testing and immunotherapy services" across the State. *Id.*, PageID 2670.

No law or regulation bars primary-care physicians from offering allergy testing or immunotherapy. *Id.*, PageID 2669–70. But these doctors historically have faced high barriers to entry. *Id.*, PageID 2669–71. To enter the market, doctors must hire technicians who know how to conduct the skin-prick tests and prepare the allergens. *Id.* And they must obtain "expensive equipment and products," such as "testing devices" and "antigens and diluents[.]" *Id.* So rather than perform these services, primary-care physicians have typically referred patients to allergists. *Id.*, PageID 2671–72. Many Tennesseans, though, live far from the closest allergist. The restricted supply has allegedly caused many "patient consumers" to forgo treatment. *Id.*, PageID

2665. And it has caused the demand for services to "greatly exceed[]" the supply. *Id.*, PageID 2668.

That is where United Allergy comes in. After recognizing the unmet demand, United Allergy began to contract with primary-care physicians to help them offer allergy testing and immunotherapy. *Id.*, PageID 2670–71. United Allergy and its partnering physicians perform different roles. United Allergy hires the technicians to "perform allergy testing and mix antigens under the" physician's supervision. Agreement, R.275-1, PageID 10151. It also provides "all supplies and equipment necessary" for testing and immunotherapy. *Id.* The physicians, by comparison, must "make all medical decisions[.]" *Id.*, PageID 10152. They interpret the test results and determine whether to prescribe immunotherapy. *Id.*; Compl., R.103, PageID 2671. Since its 2013 entry into the Tennessee market, United Allergy has helped more than 80 primary-care doctors provide allergy testing and immunotherapy. Compl., R.103, PageID 2671, 2677. Many of these physicians practice in "rural areas" where the "nearest board-certified allergist is many miles away." *Id.*, PageID 2671. And United Allergy technicians commonly teach patients how to take the shots at home, so they can avoid regular trips to a doctor's office. *Id.*, PageID 2680, 2698–99.

*Payors*. Third-party payors (including private and government insurers) pay for all or part of about "98%" of the allergy care. *Id.*, PageID 2672. Tennessee's Medicaid program ("TennCare") is one such payor. *Id.*, PageID 2678. It contracts with three managed-care organizations to insure eligible patients: Amerigroup Tennessee, Inc., BlueCare (a subsidiary of Blue Cross Blue Shield of Tennessee), and United Healthcare. *Id.*, PageID 2666–67, 2678.

The contracts between Tennessee and these three organizations run on for hundreds of pages. Agreement, R.275-1, PageID 10161–68. They require Amerigroup (along with the other two insurers) "to reimburse primary care physicians for" eligible claims involving allergy testing and immunotherapy. Compl., R.103, PageID 2678. Physicians must bill Amerigroup under general billing (or "CPT") codes. *Id.*, PageID 2673. For example, they use "CPT Code 95165" to bill for services in administering immunotherapy to a patient. *Id.*, PageID 2675.

United Allergy, by contrast, does not contract with third-party payors for its technicians' services or for the materials that it supplies to them. Rather, United Allergy receives fixed "fees" from physicians for its goods and services. Agreement, R.275-1, PageID 10152. United Allergy's standard agreement with physicians states that its final fee for a service depends on the "then current reimbursement schedule" of the third-party payor from whom physicians will seek payment (such as Amerigroup). *Id.* The agreement adds that United Allergy's services are "incident to" a physician's services for purposes of "federal and state billing guidelines" and that the physicians have the duty to ensure that they can bill for all services. *Id.*, PageID 10151.

B

United Allergy's entry into the Tennessee market in 2013 caught the attention of suppliers and payors of allergy-care services. The primary-care physicians who contracted with United Allergy had been referring their allergy patients to the Center. Compl., R.103, PageID 2672, 2678. Yet these physicians now "became competitors" to the Center's allergists. *Id.*, PageID 2678. And as more doctors treated patients, third-party payors like Amerigroup spent more reimbursing for care. *Id.*, PageID 2672. TennCare pays Amerigroup on a "per member per month" schedule set annually based on the prior year's usage patterns. *Id.*, PageID 2687. So the sharp increase in supply allegedly harmed Amerigroup's bottom-line more than TennCare's. *Id.*

According to the complaint, Amerigroup and the Center responded by conspiring to drive United Allergy and its partnering physicians from Tennessee. *Id.*, PageID 2678–79. The Center spearheaded these efforts through its management company (Physicians' Medical Enterprises) and that company's business-development director (Ned DeLozier). *Id.*, PageID 2667–68, 78–83.

In April 2014, DeLozier learned of United Allergy's threat to the Center. *Id.*, PageID 2679. He tried to lobby public officials to bar United Allergy's model and to discourage primary-care physicians from contracting with it. *Id.*, PageID 2679–80. When these efforts fell short in 2016, DeLozier turned to Amerigroup and other third-party payors. *Id.*, PageID 2680–82. He allegedly encouraged these payors to conduct costly audits of United Allergy's partnering physicians. *Id.*

Amerigroup estimated that it "stood to recover" around $6 million if it "flushed [United Allergy] out of Tennessee[.]" *Id.*, PageID 2690. Over the years, it allegedly searched for reasons to deny payment to physicians who contracted with United Allergy and submitted claims under the allergy-care billing codes. *Id.*, PageID 2684. Amerigroup hypothesized that these physicians might have engaged in "fraudulent billing" because the technicians performed without supervision. *Id.*, PageID 2687. It also hypothesized that these physicians had been providing "medically unnecessary" care. *Id.*, PageID 2688. And it hypothesized that the physicians' contracts with TennCare barred them from subcontracting work to United Allergy. *Id.*, PageID 2697–98.

From 2016 through 2019, the complaint adds, Amerigroup and DeLozier repeatedly communicated with Amerigroup's competing payors, including the other two managed-care organizations, to convince them to investigate and stop paying United Allergy's partnering physicians. *Id.*, PageID 2684–703. These conversations led all payors to ramp up their audits of these physicians, to send them "recoupment" letters for paid bills, and to bar them from billing for immunotherapy administered by patients at home. *Id.*, PageID 2697–2700. The insurers also agreed to "fixed prices" by reimbursing for a much smaller number of immunotherapy "doses" than they had previously allowed. *Id.*, PageID 2701.

The complaint says that the harassing efforts succeeded. Many primary-care physicians stopped offering allergy-care services because Amerigroup and other insurers would not reimburse them for these services and because they feared getting kicked out of TennCare. *Id.*, PageID 2703–04. And United Allergy lost "profits" because these physicians refused to pay its fees and later terminated their contracts with the company. *Id.*, PageID 2704. The reduction in output also left many patients without access to allergy care (especially in rural areas). *Id.*, PageID 2704–05.

C

United Allergy sued Amerigroup, two Blue Cross entities, the Center, Physicians' Medical Enterprises, and DeLozier. *Id.*, PageID 2666–68. We will refer to the last three (related) defendants as the "Center." And United Allergy has since settled with the Blue Cross

entities.  The complaint asserted two federal antitrust claims and three state tort claims.  As for the federal claims, it alleged that the defendants violated § 1 of the Sherman Act by conspiring to eliminate United Allergy and primary-care physicians from the allergy-care markets.  *Id.*, PageID 2705–08.  It next alleged that the Center violated § 2 of the Sherman Act by monopolizing these markets and that the others conspired to permit its monopoly.  *Id.*, PageID 2708–11.  As for the state claims, the complaint alleged that the defendants tortiously interfered with United Allergy's contracts with physicians.  *Id.*, PageID 2711–15.  It alleged that they also tortiously interfered with United Allergy's prospective relationships with physicians.  *Id.*, PageID 2714–15.  And it alleged that they entered a civil conspiracy.  *Id.*, PageID 2715.

This litigation progressed in two stages.  The defendants first moved to dismiss United Allergy's complaint.  The district court dismissed the federal antitrust claims on the ground that United Allergy lacked "standing" to sue under the antitrust laws.  *See United Biologics, LLC v. Amerigroup Tenn., Inc.*, 2022 WL 22897162, at *4–9 (E.D. Tenn. Jan. 27, 2022).  But the court permitted the state-law claims to proceed.  *See id.* at *9–11.  After discovery, the defendants moved for summary judgment on those claims.  The district court then granted that motion.  *See United Biologics, LLC v. Amerigroup Tenn., Inc*., 2024 WL 770640, at *1 (E.D. Tenn. Jan. 18, 2024).

United Allergy appealed.  It now challenges the dismissal of its antitrust claims and the grant of summary judgment on its tort claims.  We review both decisions de novo.  *See Aldridge v. Regions Bank*, 144 F.4th 828, 836 (6th Cir. 2025).

## II. Federal Antitrust Claims

The Sherman Act contains two main prohibitions.  Section 1 makes it illegal for businesses to enter a "contract," "combination," or "conspiracy" "in restraint of trade or commerce among the several States[.]"  15 U.S.C. § 1.  And § 2 makes it illegal for businesses to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States[.]"  *Id.* § 2.  We may assume that United Allergy has alleged violations of these sections.  But this case is not about the merits.  It is about the remedies.  And like the district court, we conclude that United

Allergy has alleged only indirect injuries that flow out of the harms the defendants inflicted on physicians. Unlike the district court, though, we characterize this defect as a lack of causation rather than "standing."

A. Antitrust "Standing"

The Sherman Act's private right of action states: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . , and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). On its face, this text could be read to permit any actor to sue for any harm that an antitrust violation causes. *See Associated Gen. Contractors v. Cal. State Council*, 459 U.S. 519, 529 (1983). That view, though, would subject defendants to unlimited liability because "antitrust violation[s]" often "cause ripples of harm" throughout the economy. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982).

Consider the harms from a classic manufacturers' cartel that raises prices and reduces output. The cartel will harm retailers by requiring them to pay higher wholesale prices. *Cf. Ill. Brick Co. v. Illinois*, 431 U.S. 720, 726–27 (1977). It will harm end consumers too if the retailers pass on some of the cartel's overcharge to them in the form of higher retail prices. *Cf. id.* at 727. The reduced output might also harm the government by lowering its tax base. *Cf. Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 255 (1972). Further, some retailers might not survive under the higher prices. So the cartel will have injured the shareholders of these bankrupt retailers. *Cf. Stein v. United Artists Corp.*, 691 F.2d 885, 894–97 (9th Cir. 1982) (Kennedy, J.); *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d Cir. 1910). The cartel will have injured the bankrupt retailers' other suppliers as well if those suppliers lose sales that they would have made to the retailers. *Cf. Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 406 (6th Cir. 2012), *aff'd on other grounds by* 572 U.S. 118 (2014). The retailers' creditors (say, landlords) also might not get paid what the retailers owe (say, rent). *Cf. Apple*, 587 U.S. at 291 (Gorsuch, J., dissenting). And their employees might lose their jobs. *Cf. Associated Gen. Contractors*, 459 U.S. at 541 n.46. In short, the list of harmed parties could go on and on.

May all these parties seek treble damages from the cartel? No, the Supreme Court has not read § 15(a) that way. In *Associated General Contractors*, it instead held that the law permits suit only by those who have what some have dubbed "antitrust standing." *Id.* at 535 n.31. In that case, construction contractors and their trade association sought to harm unions by "coerc[ing]" customers (landowners who needed construction work) and contractors (the defendants and their competitors) to shift business "to nonunion firms." *Id.* at 527–28. Yet the Court refused to allow the unions to sue. *Id.* at 536–46. It conceded that they alleged some facts that supported the suit: that the conspiracy had caused their harm and that the defendants had "intended" it. *Id.* at 537. But these allegations fell short. Among other reasons, the unions did not participate as competitors or consumers in the construction market. *Id.* at 539. Rather, they sought better pay for their members through labor cooperation (not competition). *Id.* at 539–40. The unions thus did not rely on a "type" of harm (reduced competition) that "the antitrust statute was intended to forestall." *Id.* Next, the unions suffered "indirect" and "speculative" injuries that flowed out of the harms to the customers and contractors. *Id.* at 540–42. So their suit would create a "risk of duplicate recoveries" and require a "complex apportionment of damages" among victims. *Id.* at 544.

Soon after *Associated General Contractors*, we identified five "factors" to decide whether a plaintiff has antitrust standing. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (citation omitted). First: Did the antitrust violation cause the plaintiff's injury and did the defendant intend it? *See id.* Second: Was the plaintiff's "alleged injury" the type that the antitrust laws seek to prevent? *Id.* Third: Was the injury direct or indirect and were the damages concrete or speculative? *See id.* Fourth: Did the suit create a risk of "duplicative recovery" by multiple victims or require a "complex apportionment of damages" among those victims? *Id.* And fifth: Do "more direct victims" who could sue exist? *Id.*

At times, we have said that courts should engage in an ad hoc "balancing" of these factors (and that we will treat no factor as "conclusive"). *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 846 (6th Cir. 1990) (per curiam); *see Static Control*, 697 F.3d at 402; *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000); *Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047, 1050–51 (6th Cir. 1986). Yet what happens when the factors point in

different directions? Should we add them up and decide where the majority lands? May we find one factor "really" important in a case? If so, when? Here, as elsewhere, amorphous balancing tests can produce "unpredictable and at times arbitrary results." *Lexmark*, 572 U.S. at 136.

In practice, then, we have avoided this balancing. Most notably, we have held that plaintiffs must prove an "antitrust injury" in *all* cases. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)). Plaintiffs thus must always satisfy our second factor (which asks about the "nature" of their injury). *See Southaven*, 715 F.2d at 1085–86. And we regularly reject suits for the lack of an antitrust injury alone. *See NicSand*, 507 F.3d at 450–59; *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88–91 (6th Cir. 1989); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1110–11 (6th Cir. 1989).

Next, the other four factors go to the same question: has the plaintiff shown that the antitrust violation was both a cause in fact and a "proximate cause" of the harm? *Apple*, 587 U.S. at 279. In addition to the factor that expressly lists causation, two others consider the "directness" of the injury and whether "more direct victims" could sue. *Southaven*, 715 F.2d at 1085. And the Supreme Court has since made clear that these directness questions form part of the proximate-cause calculus. *See Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268–69 (1992).

The Supreme Court's *Lexmark* decision confirms this logic. There, the Court addressed a similar question: who may sue under the Lanham Act, 15 U.S.C. § 1125(a)? *See* 572 U.S. at 120. The Court answered that question by incorporating two "background principles" into the Act: that a plaintiff must fall within a statute's "zone of interests" and that the defendant must have "proximately caused" the injury. *Id.* at 129–34. In the process, the Court clarified that "standing" is the wrong label for this who-may-sue question because the question raises an ordinary problem "of statutory interpretation" about the meaning of § 1125(a)'s text. *See id.* at 128. And the Court rejected an "open-ended balancing" test that was nearly identical to the one that we and other circuit courts have sometimes proposed in this antitrust context. *Id.* at 135–36.

Extended to the Sherman Act, *Lexmark* confirms that antitrust courts should not abstractly balance various factors against each other. Rather, they should ask whether plaintiffs have alleged an "antitrust injury" and "proximate causation." We thus turn to those two elements.

## B. Antitrust Injury

### 1. What Types of Harms Count As "Antitrust Injuries"?

The Supreme Court presumes that Congress enacts legislation with knowledge of the presumption that only plaintiffs who "fall within the zone of interests protected by" a law may invoke its protections. *Id.* at 129 (citation omitted). In the antitrust context, this interpretive principle has produced the "antitrust injury" requirement. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Section 15(a) allows plaintiffs to recover damages only if they suffered harm "by reason of anything forbidden in the antitrust laws[.]" 15 U.S.C. § 15(a). The Supreme Court has interpreted that phrase to require proof that a plaintiff's harm grew out of the underlying "rationale" for why the antitrust laws made the challenged conduct illegal. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). Put differently, plaintiffs may recover damages only if they show that they suffered a "type" of harm that Congress designed the antitrust laws to prevent. *Brunswick*, 429 U.S. at 489 (citation omitted).

Courts thus must explore the purposes of §§ 1 and 2 of the Sherman Act. Those laws represent a "consumer welfare prescription" from Congress. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (quoting Robert H. Bork, *The Antitrust Paradox* 66 (1978)). When suppliers enter cartels or undertake monopolizing acts, their conduct has a similar "anticompetitive effect": it increases prices and reduces output as compared to the price and output levels in competitive markets. *Brunswick*, 429 U.S. at 489; *see Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986). This effect harms two sets of consumers. It harms *actual* consumers who still buy at the higher price because they must pay the "illegal overcharge" (the difference between the higher cartel or monopoly price and the lower competitive price). *Ill. Brick*, 431 U.S. at 724. It also harms *potential* consumers who now refuse to buy at the higher price (hence why these violations reduce output). *See Howard Hess Dental Labs. Inc. v.*

*Dentsply Int'l, Inc.*, 424 F.3d 363, 374 (3d Cir. 2005). And while these "would-be buyers" who forgo purchases lack the right to sue for other reasons, actual purchasers represent the "preferred plaintiffs" who suffer the core antitrust injury. IIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 345a, at 197 & n.2 (5th ed. 2021); *Reiter*, 442 U.S. at 343.

That said, this case requires us to add a wrinkle to this usual analysis. Typically, a group of *sellers* or one monopolistic seller engages in the acts prohibited by §§ 1 and 2. But a group of *buyers* or a monopsony buyer might also violate these sections. *See Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235–36 (1948); XII Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* § 2012, at 140 (4th ed. 2019). A buyers' cartel has "symmetrical" anticompetitive effects to a sellers' cartel: the cartel lowers (rather than raises) prices and reduces output below the competitive level. *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 601–02 (7th Cir. 1984). In other words, a buyers' cartel charges "monopsony prices" (the prices that a single buyer would demand) in the way that a sellers' cartel charges "monopoly prices" (the prices that a single seller would charge). *Id.*; *see Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). The suppliers who sell to a buyers' cartel thus qualify as preferred plaintiffs who suffer a core antitrust injury too. *See* IIA Areeda & Hovenkamp, *Antitrust Law* § 350b, at 298–99.

Who else might sue? We have held that "competitors" harmed by a defendant's antitrust violations also may suffer the right kind of injury. *Static Control*, 697 F.3d at 404. Yet courts must evaluate a competitor's suit more cautiously. The antitrust laws protect "*competition*, not *competitors*." *Brunswick*, 429 U.S. at 488 (citation omitted). And an antitrust violator's competitors often have "divergent rather than congruent interests" to consumers. *Ball Mem'l Hosp.*, 784 F.2d at 1334; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986). So a competitor's lost profits may not be "a close approximation of the [antitrust] injury caused by" a cartel's or monopolist's "overcharges." Frank H. Easterbrook, *Treble What?*, 55 Antitrust L.J. 95, 96 (1986). Suppose, for example, a large company violated the antitrust laws by merging with near-bankrupt bowling alleys and saving them from closure. *See Brunswick*, 429 U.S. at 480–81. Even if a competitor to these bowling alleys proved this antitrust violation, it could not recover the profits it would have obtained if the illegal merger had

not occurred and the bowling alleys had closed. *See id.* at 487–88. After all, the competitor's lost profits in that scenario would have arisen from the *increased* competition that resulted from the otherwise illegal merger (which barred the competitor from harming consumers by charging higher prices). *See id.*

To prove an antitrust injury, then, competitors must show that their "loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344. Perhaps rivals who had formed an illegal cartel teamed up to eliminate a competitor who was undercutting the cartel prices. *See Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782–83 (7th Cir. 1994). Or perhaps competitors who must cooperate in an industry (such as real-estate agents on both sides of a home sale) tried to drive out a rival by refusing to deal with the rival in home sales. *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1014–15 (6th Cir. 1999); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103–05 (3d Cir. 2010).

What about other businesses less connected to the market? The Supreme Court has noted that a plaintiff is less likely to have incurred an antitrust injury if it is neither a "consumer nor a competitor in the market" that the defendants restrained. *Associated Gen. Contractors*, 459 U.S. at 539; *see In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). Courts thus have found that third parties who helped a competitor (such as suppliers, employees, or advertisers) did not suffer an antitrust injury from a defendant's anticompetitive conduct—at least not when the defendant "directed" that conduct at the competitor (rather than the third parties). IIA Areeda & Hovenkamp, *Antitrust Law* § 350d, at 305–06; *Static Control*, 697 F.3d at 404; *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182–83 (3d Cir. 1997) (Alito, J.); *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596–98 (7th Cir. 1995); *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995). When third-party harm is mere "collateral damage" to (or "a tangential byproduct of") the anticompetitive conduct, the harm does not count as an antitrust injury. *Aluminum Warehousing*, 833 F.3d at 163; *Static Control*, 697 F.3d at 404.

*2. Did United Allergy Allege An Adequate Antitrust Injury?*

The district court held that United Allergy failed to allege an antitrust injury under this law. *See United Biologics*, 2022 WL 22897162, at *5–8. But we find this question difficult. On the one hand, United Allergy appears to be neither a "consumer nor a competitor" in the market affected by the anticompetitive conduct: the market for "allergy testing and immunotherapy" in Tennessee. *Associated Gen. Contractors*, 459 U.S. at 539; Compl., R.103, PageID 2671. Consider this market's two sides. Who are on the buyer's side? The patients who receive treatment are the main "consumers" (as the complaint calls them). Compl., R.103, PageID 2665. And the insurers—including Amerigroup and the other managed-care organizations—sit on the buyer's side because they act as "purchasing agents" for these consumers. *Ball Mem'l Hosp.*, 784 F.2d at 1334; *see Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 924 (1st Cir. 1984) (Breyer, J.). Who are on the seller's side? The doctors—both the Center's "allergists" and the primary-care physicians who want to compete with them—are the primary suppliers. Compl., R.103, PageID 2669–70. These doctors must perform the allergy testing and immunotherapy services and supervise the technicians who help them. *Id.*, PageID 2668–70, 2674–75. And only they may bill insurers for these services. *Id.*, PageID 2678.

Where do these facts leave United Allergy? In many ways, it resembles a "supplier" to the primary-care physicians and operates in a distinct market vertically upstream of the affected one. *Static Control*, 697 F.3d at 404, 406. United Allergy provides physicians with the materials and personnel (equipment, products, and technicians) they need to compete with the Center's allergists. Compl., R.103, PageID 2671. In fact, the complaint refers to primary-care physicians *themselves* as United Allergy's "customers" who buy its goods and services for a "fee" in this upstream market. *Id.*, PageID 2665, 2671, 2697. And United Allergy could not "sell or distribute" its goods or services *directly* to patients in the downstream market because only doctors may offer allergy testing and immunotherapy to patients. *Barton & Pittinos*, 118 F.3d at 182. The Center, by comparison, allegedly integrated upstream by employing its own technicians and supplying its own equipment. Compl., R.103, PageID 2672, 2677. These market dynamics might suggest that United Allergy did not suffer an antitrust injury because a

"supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services." *W. Penn Allegheny Health Sys.*, 627 F.3d at 102; *see Static Control*, 697 F.3d at 406.

On the other hand, a preeminent antitrust treatise explains that when a plaintiff sells to a third party and the two businesses *together* compete with an *integrated* defendant, both the plaintiff and the third party are the defendant's "competitors" in "every relevant economic sense." IIA Areeda & Hovenkamp, *Antitrust Law* § 348f, at 285. The complaint also suggests that United Allergy did not simply suffer "collateral damage" from anticompetitive conduct directed at primary-care physicians. *Aluminum Warehousing*, 833 F.3d at 163. It suggests that United Allergy was also a "direct target" of the conduct. Compl., R.103, PageID 2666.

Lastly, the complaint might suggest that United Allergy suffered a "type" of harm that the antitrust laws seek to prevent, *Brunswick*, 429 U.S. at 489 (citation omitted), because its injuries arose "from a competition-*reducing* aspect" of the antitrust violations. *Atl. Richfield*, 495 U.S. at 344. United Allergy alleges an agreement between a seller (the Center) and several buyers (Amerigroup, the other managed-care organizations, and Blue Cross) to "fix prices and boycott competition at the primary care level." Compl., R.103, PageID 2702. As for price fixing, the complaint suggests that the insurers agreed "to fix prices for allergen immunotherapy at a set amount of units" by "adopt[ing] similar reimbursement policies" for claims. *Id.*, PageID 2686; *cf. Mandeville*, 334 U.S at 235–36. As for the boycott, the complaint suggests that Amerigroup and the other insurers agreed "to harass all primary care providers" who offered allergy testing and immunotherapy by auditing them, denying their claims, and seeking to recoup payments. Compl., R.103, PageID 2680, 2697–700, 2703; *cf. NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135–36 (1998). The reduced competition resulting from this horizontal cartel and boycott would decrease prices and output below competitive levels. *See Omnicare*, 629 F.3d at 705. And although the suppliers to this alleged cartel—the physicians who receive less pay and provide less services—might represent the preferred plaintiffs, *see* IIA Areeda & Hovenkamp, *Antitrust Law* § 350b, at 298–99, the derivative injuries to United Allergy arose from the same reduction in competition.

Given these uncertainties about the antitrust-injury requirement, we opt to avoid this issue. Even if United Allergy suffered such an injury, its suit still fails on proximate-causation grounds.

## C. Proximate Causation

### 1. When Do Antitrust Violations "Proximately Cause" A Plaintiff's Injuries?

The Supreme Court also interprets private rights of action against the common-law rule that plaintiffs may recover only if a defendant "proximately caused" their injuries. *Lexmark*, 572 U.S. at 132; *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017). And the Court has incorporated this rule into § 15(a) because that law permits a plaintiff to sue only if the injury occurred "by reason of" an antitrust violation. 15 U.S.C. § 15(a); *Apple*, 587 U.S. at 279.

Proximate causation imposes several limits on a defendant's liability. *See Holmes*, 503 U.S. at 267. This doctrine sometimes bars a suit when the defendant could not reasonably foresee the type of injury the plaintiff suffered. *See Scheffer v. R.R. Co.*, 105 U.S. 249, 251–52 (1881). The doctrine also sometimes bars a suit if a "superseding cause" stood between the defendant's conduct and the plaintiff's injury. *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (citation omitted). And most relevant here, the doctrine sometimes bars a suit if a "direct relation" does not exist "between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. When, for example, a defendant injures a third party, a plaintiff might be unable to recover for *derivative* harms that flow out of that third party's injuries. *See id.* at 268–69 (citing 1 J. Sutherland, *Treatise on the Law of Damages* 55–56 (1882)). As Justice Holmes put it, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918).

In the antitrust context, the Supreme Court has turned this general directness element into a specific "rule" that applies when antitrust violators harm multiple parties along a vertical "chain" of distribution. *Apple*, 587 U.S. at 279. The rule permits only "*direct* purchasers" (not "*indirect* purchasers") to sue a cartel or monopolist. *Id.* The Court adopted this rule in a pair of cases: *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick*. In *Hanover Shoe*, the Supreme Court identified the damages that arise to those who

directly buy from a cartel or monopolist as the "amount of the overcharge" between the higher cartel or monopoly price and the lower market price. 392 U.S. at 489. The Court calculated damages in this way even though the plaintiff in that case was not an end consumer and had likely passed on some of this overcharge to its own customers in the form of higher prices. *See id.* at 492–93. The defendant thus sought to reduce its damages to the plaintiff by showing that the plaintiff had avoided all or part of the overcharge's harm. *See id.* at 491–92. The Court rejected this "passing-on defense" to damages. *Id.* at 492–94. Why? It thought that the "task" of proving the defense "would normally prove insurmountable." *Id.* at 493. It added that common-law rules would bar such a mitigation-of-damages theory. *Id.* at 490 & n.8 (discussing *S. Pac.*, 245 U.S. at 533–34).

*Illinois Brick* represents the "mirror image" of *Hanover Shoe*. William M. Landes & Richard A. Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick, 46 U. Chi. L. Rev. 602, 603 (1979). There, a manufacturers' cartel sold bricks to intermediaries, who resold the bricks (and passed on part of the cartel's overcharge) to end purchasers. *Ill. Brick*, 431 U.S. at 726. The "indirect" end purchasers sued the manufacturers to recover the passed-on overcharge. *Id.* But the Supreme Court rejected their suit. Just as a defendant cannot use a "pass on" theory in a "defensive" way to reduce the damages owed to a direct purchaser, so too an indirect-purchaser plaintiff cannot use the "pass-on" theory in an "offensive" way to seek damages. *Id.* at 729–30. The Court adopted this view to eliminate the "serious risk of multiple liability for defendants." *Id.* at 730. And it adopted this view because the "difficulties in analyzing price and output decisions" remained no matter who asserted the pass-on theory. *Id.* at 731–32; *see Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207–08 (1990).

*Illinois Brick*'s bright-line rule applies no matter which way the harm flows along a vertical chain of distribution. Take a buyers' cartel that reduces prices and output below competitive levels. Sometimes the cartel's "undercharge" (the difference between the higher market price and the lower cartel price) will harm not just direct sellers from whom it buys (say, wholesalers) but also indirect sellers from whom the direct sellers buy (say, manufacturers). And *Illinois Brick* necessarily covers this reverse situation by permitting only the direct (not the

indirect) sellers to sue the buyers' cartel. *See Zinser v. Cont. Grain Co.*, 660 F.2d 754, 760–61 (10th Cir. 1981); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1158–59 (5th Cir. 1979); IIA Areeda & Hovenkamp, *Antitrust Law* § 346g, at 228–29.

Nor can indirect purchasers (or sellers) avoid *Illinois Brick* by calculating their damages using "lost profits" rather than an "overcharge" (or "undercharge") valuation. A horizontal cartel inflicts two harms on direct purchasers. They pay the overcharge for the products they *continue* to buy, and they lose the additional profits they would have made for the products they *stop* buying (and selling downstream to indirect purchasers) at the higher price. *See Howard Hess*, 424 F.3d at 373–74. Direct purchasers may seek to recover both the overcharge from the completed sales and the lost profits from the "lost sales." *UtiliCorp*, 497 U.S. at 212–13. And *Illinois Brick* leaves no doubt that indirect purchasers may not recover the overcharge. *See id.* at 204. But may these indirect purchasers at least recover the lost profits from the reduced output that flows down the distribution chain along with the overcharge? No, the Supreme Court's bright-line rule bars indirect purchasers from suing *altogether*—even if they seek these "lost profits as opposed to overcharge damages." *Howard Hess*, 424 F.3d at 375.

At the same time, courts must not overread *Illinois Brick*. Its bright-line rule does not "bar multiple liability that is unrelated to passing an overcharge down a chain of distribution." *Apple*, 587 U.S. at 287. Antitrust violators sometimes *directly* contract with two parties—say, a retailer who buys from suppliers and sells to consumers or a "two-sided platform" (like a credit-card company) that facilitates an exchange between two sets of customers (card holders and retailers). *See id.* at 282–85; *Ohio v. Am. Express Co.*, 585 U.S. 529, 546 (2018). Take Apple, which connects consumers who want to buy apps in the App Store on its iPhones with suppliers who create these apps and put them in that store. *See Apple*, 587 U.S. at 276–77. If Apple has a monopoly, it might force iPhone users to pay an overcharge for the apps, and it might force app creators to sell at an undercharge to Apple. *See id.* at 286–88. In that scenario, both sides *directly* purchased or sold to Apple, so both may sue for their discrete damages. *See id.* at 287–88. Neither qualifies as an indirect purchaser or seller. *See id.*; *see also McCready*, 457 U.S. at 467–68.

One last point. Even if the categorical rule from *Illinois Brick* does not apply, a plaintiff might still not satisfy proximate causation under all the facts. *See, e.g.*, *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138–43 (2d Cir. 2021). Many decisions, for example, bar suits by "employees with merely derivative injuries" that arise from harms inflicted on their employers. *Associated Gen. Contractors*, 459 U.S. at 541 n.46. This harm might not fall within *Illinois Brick*, but it would not satisfy proximate causation all the same. *See Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 27–31 (D.C. Cir. 1987). Or take *potential* purchasers who do not buy at a cartel price but who would have bought at the market price. These plaintiffs also would not fall within *Illinois Brick* because they sit at the correct level of the distribution chain. But the "existing rule" bars them from suing given the speculation required to decide whether they would have bought. Frank H. Easterbrook, *Detrebling Antitrust Damages*, 28 J. L. & Econ. 445, 463 (1985) (citing *Montr. Trading Ltd. v. Amax Inc.*, 661 F.2d 864, 867–68 (10th Cir. 1981)); IIA Areeda & Hovenkamp, *Antitrust Law* §§ 345a at 197 n.2, 391b1 at 399. Likewise, would-be suppliers cannot simply claim they would have opened a business but for a defendant's anticompetitive conduct. *See* IIA Areeda & Hovenkamp, *Antitrust Law* § 349a, at 289. Rather, they must identify concrete steps they took to enter. *See id.* at 289–94; *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1272–73 (11th Cir. 2013); *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1464–66 (9th Cir. 1993); *Huron Valley Hosp., Inc. v. City of Pontiac*, 666 F.2d 1029, 1033 (6th Cir. 1981). In sum, "[n]o single formula captures the required proximity." IIA Areeda & Hovenkamp, *Antitrust Law* § 339a, at 147.

*2. Did The Alleged Antitrust Violations "Proximately Cause" United Allergy's Injuries?*

United Allergy has not plausibly alleged proximate causation under this framework. Most notably, its complaint asserts the indirect harms that fall within the "bright-line rule" from *Illinois Brick*. *Apple*, 587 U.S. at 279. As we have said, the complaint alleges that the Center orchestrated a horizontal agreement among Amerigroup and its competing insurers to "fix prices and boycott competition at the primary care level." Compl., R.103, PageID 2702. Amerigroup and the other insurers allegedly "fixed prices at the reimbursement level of 150 doses/units per member per calendar year with a 3-month supply reimbursement restriction[.]" *Id.*, PageID

2701. So if physicians provided doses above these limits, the insurers paid zero. *Id.*, PageID 2702. The insurers also allegedly conspired to deny the physicians' claims on several pretextual grounds. *Id.*, PageID 2706–07. This horizontal agreement thus caused two basic harms: the insurers denied claims for *completed sales* (in which physicians had already provided allergy-care services to patients) and the insurers caused the market to suffer from *lost sales* (by incentivizing the physicians to stop seeing patients because they knew they would not get paid).

But the complaint leaves no doubt that the physicians—not United Allergy—directly suffered these harms. First consider the completed sales. The physicians directly sold to the insurers and so directly suffered the undercharge from the horizontal agreement (the difference between the market reimbursement rate and the insurers' agreed rate of zero). Indeed, at least one physician identified in the complaint (Dr. Christopher Sewell) sued to recover the full amount of his "unreimbursed" claims (that is, the *entire* undercharge). Am. Compl., R.42, in *C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc.*, No. 2:17-cv-00062 (M.D. Tenn. Sept. 22, 2017); *see* Compl., R.103, PageID 2695. United Allergy, by contrast, was "two . . . steps removed from the antitrust violator[s] in [the] distribution chain" because it sold to physicians (its "customers") for a fee. *Apple*, 587 U.S. at 280; Compl., R.103, PageID 2671, 2677. And even if the physicians passed on some of the insurers' undercharge to United Allergy (by refusing to pay its fees if they did not get paid themselves), United Allergy could not sue as an indirect seller. *See Zinser*, 660 F.2d at 760–61; *Beef Indus.*, 600 F.2d at 1158–59. If *both* the physicians could recover the full undercharge on these completed sales *and* United Allergy could recover damages for the same sales, its suit would create a "risk of duplicative recoveries" for the same injury. *Ill. Brick*, 431 U.S. at 730.

To be sure, United Allergy does not just seek damages for completed sales. It also seeks far more damages for the *lost* sales that resulted from the vastly lower output at the fixed price of zero. Its complaint alleges that the anticompetitive conduct reduced its output both because its existing primary-care physicians suffered a "decrease in services" (they saw fewer patients) and because prospective physicians refused to enter "new contracts" (they saw no patients). Compl., R.103, PageID 2704. We see two problems with this theory. For one, only direct purchasers or sellers may recover for the "lost sales" (independent of any overcharge or undercharge) that flow

out of an anticompetitive action's reduction in output. *UtiliCorp*, 497 U.S. at 212–13. The Supreme Court has read *Illinois Brick* to set forth a clear "rule of contractual privity," and United Allergy had no contractual relationship with the insurers. *Apple*, 587 U.S. at 289 (Gorsuch, J., dissenting).

For another thing, even apart from *Illinois Brick*'s rule, United Allergy seeks "highly speculative" damages. *Associated Gen. Contractors*, 459 U.S. at 542. Take its request to recover lost profits for the sales it might have made to *prospective* physicians who refused to contract with it because of the insurers' anticompetitive conduct. Just as "would-be buyers" may not recover from a sellers' cartel, "would-be" suppliers (like these prospective physicians) generally may not sue unless they establish that they took concrete steps to enter the market. *See* IIA Areeda & Hovenkamp, *Antitrust Law* § 345a, at 197 n.2; *Dual-Deck*, 11 F.3d at 1464–66. And it would make no sense to allow a further-removed indirect seller (United Allergy) to sue if these unidentified physicians cannot. United Allergy would have to prove that the physicians refused to enter the market as "the result of the alleged" anticompetitive conduct. *Holmes*, 503 U.S. at 273. But the physicians could have refrained from doing so "for any number of reasons unconnected" to that conduct. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

United Allergy's contrary arguments do not convince us otherwise. *First*, United Allergy claims that *Illinois Brick* does not apply here because it alleges that the defendants participated in a "boycott" rather than a price cartel. Appellant's Supp. Br. 7. Set aside that the complaint repeatedly alleges that the insurers "fixed prices" (or engaged in "price fixing")—not just that they engineered a boycott. Compl., R.103, PageID 2665, 2686, 2697, 2701–02, 2706–07, 2709–10. Plaintiffs cannot avoid *Illinois Brick* through artful pleading. *See Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 967 (3d Cir. 1983). That decision establishes a proximate-causation rule tied to § 15(a)'s "by reason of" language—not a rule of substantive liability tied to §§ 1 or 2. So we see no textually plausible path for holding that a party who is "two or more steps removed from the antitrust violator in a distribution chain" may sue if the party alleges something other than price fixing. *Apple*, 587 U.S. at 280. And whether the defendants' conduct is labeled a boycott, a cartel, or anything else, United Allergy's harms are "two . . . steps removed from the antitrust violator[s]" because its harms flow out of the injuries

inflicted on its "customers" up the chain: the physicians. *Id.*; Compl., R.103, PageID 2665. Indeed, the complaint alleges a "boycott" at the "primary care *level*"—meaning a boycott of the "primary care physicians" (directly) and United Allergy (indirectly). Compl., R.103, PageID 2705–06 (emphasis added).

The cases on which United Allergy relies for this point do not support a different result. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997); *see also Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 n.17 (4th Cir. 2007); *Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 585 n.47 (3d Cir. 1979). In *Brand Name Prescription Drugs Antitrust Litigation*, Judge Posner suggested in dicta that *Illinois Brick* "would fall away" if the plaintiffs had alleged a "boycott" rather than price fixing. 123 F.3d at 606. But United Allergy ignores his reason why. *Illinois Brick* would not apply to a boycott theory in that case because the plaintiffs could have alleged that the defendants refused "to enter into *direct* contractual relations" with the defendants—so they would have suffered the boycott harms directly (not through the boycott of other parties). *Id.* Judge Posner even conceded that *Illinois Brick* might apply to a boycott allegation if the plaintiffs were still "seeking to recover overcharges, for that would entail the very [pass-through] analysis that *Illinois Brick* bars." *Id.* As for *Mid-West Paper Products*, the Third Circuit has since clarified that it did not limit *Illinois Brick* to cartel claims. *Merican*, 713 F.2d at 967. So *Merican* applied *Illinois Brick* to boycott allegations. *See id.* at 966–68. Lastly, the Fourth Circuit in *Novell* found that the plaintiff was the "most direct victim" of the anticompetitive conduct in that case and did not suffer its injury indirectly through harms inflicted on others. 505 F.3d at 319. That case thus did not implicate *Illinois Brick*.

*Second*, United Allergy argues that its request for "lost profits" (rather than for undercharge damages) eliminates the concerns with "duplicative recovery" that drove *Illinois Brick* and so eliminates the need for us to apply its rule here. Appellant's Supp. Br. 8–10. United Allergy's premise is true: *Illinois Brick* expressed concern with the "risk of duplicative recoveries" from allowing indirect purchasers to sue. 431 U.S. at 730. Recall that *Hanover Shoe* held that a direct purchaser could recover the *full* overcharge from a monopolist even if the purchaser passed on that overcharge to its consumers. *See* 392 U.S. at 489–94. To allow the

indirect consumers to recover the passed-on overcharge, then, would force the defendant to pay twice for the same harm. *See Ill. Brick*, 431 U.S. at 730–31. This duplicity risk might arise here if, for example, physicians like Dr. Sewell could recover the *full* undercharge for *denied* claims on completed sales (that is, the difference between the market price and the fixed lower price of $0 that the insurers agreed to). Still, we agree that this duplicity concern would not arise if courts limited *both* direct and indirect victims *only* to their lost profits. Here, for example, if the primary-care physicians could seek only the lost profits from both completed and lost sales, their damages would exclude their costs (which would include United Allergy's set fees on these sales). United Allergy and the physicians thus would have nonoverlapping damages under this damages measure.

But United Allergy's conclusion (that *Illinois Brick* should not apply) does not follow from this premise. To the contrary, this logic would overrule *Illinois Brick*. As the Third Circuit has explained, indirect purchasers and sellers could always recharacterize their damages as lost profits rather than overcharges or undercharges for completed sales. *See Howard Hess*, 424 F.3d at 376. But *Illinois Brick categorically* bars suits by indirect purchasers or sellers; it does not bar them from only specific types of remedies. *See id.* at 375–76. This reading of *Illinois Brick* best reconciles it with § 15(a)'s text. Under that text, a plaintiff may sue only for harms suffered "by reason of" an antitrust violation. We do not see how one type of harm to an indirect party (the lost profits for lost sales) could qualify as "by reason of" the violation while another type of harm to that party (the undercharge or overcharge for completed sales) could not. *See id.* at 375–76. Put another way, *Illinois Brick* adopts a *plaintiff*-specific rule, not a *damages*-specific rule.

Besides, *Illinois Brick* did not establish its rule just because of the risk of duplicative damages. It also established its rule because "of the uncertainties and difficulties in analyzing price and output decisions 'in the real economic world rather than an economist's hypothetical model[.]'" *Ill. Brick*, 431 U.S. at 731–32 (citation omitted). And it established its rule because of the administrative concerns with forcing judges and juries to make these calculations. *See id.* at 732. These concerns remain even if an indirect seller labels its claim as one for "lost profits" rather than an undercharge. *See* IIA Areeda & Hovenkamp, *Antitrust Law* § 346g, at 228.

Lastly, *Illinois Brick* creates a "bright-line rule" that applies across the board—not a fact-specific standard that courts may disregard when its rationales are absent. *Apple*, 587 U.S. at 279. So even when all agreed that a state-regulated utility passed on 100% of an energy cartel's overcharge to consumers, the Court still held that those consumers could not sue. *See UtiliCorp.*, 497 U.S. at 208–17. The Court thought it "unwarranted" to decide on the applicability of *Illinois Brick* on a case-by-case basis. *See id.* at 217. And once we accept that *Illinois Brick* applies to indirect sellers (not just purchasers), its "bright-line rule" covers this case. *Apple*, 587 U.S. at 279.

*Third*, United Allergy suggests that *Illinois Brick* should not apply because the complaint describes United Allergy as the "intended target" of the anticompetitive conduct. Appellant's Br. 29. And it claims that proximate causation always exists for the intended victims of intentional torts. But this "'target' theory of antitrust liability would nullify the doctrine of *Illinois Brick*." *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 822 (7th Cir. 2015) (Posner, J.). A manufacturers' cartel almost always targets the end consumers for higher prices—that is, it almost "always *knowingly* causes injury to" these "indirect purchasers"—because it will set its wholesale prices based on the anticipated higher retail prices that its price fixing will cause downstream. *See id.* at 823. But indirect purchasers could not avoid *Illinois Brick* by claiming that the cartel intended their downstream harms. *See id.* at 822. The same logic should also apply in reverse to a buyers' cartel: an indirect seller cannot avoid *Illinois Brick* with the claim that the cartel intended to "driv[e]" the indirect seller "out of business" through its anticompetitive conduct. IIA Areeda & Hovenkamp, *Antitrust Law* § 346g, at 228. As a treatise has explained, "[s]o long as *Illinois Brick* stands, the courts cannot allow evasion of its policies by artfully transforming a monopsony undercharge claim into a plan to destroy . . . upstream producers" like United Allergy. *Id.*

Even apart from *Illinois Brick*, the Supreme Court's cases contradict United Allergy's claim that the intended victims of antitrust violations always satisfy proximate cause. The unions in *Associated General Contractors*, for example, alleged that the conspiring trade association and contractors "intended to cause" them harm. 459 U.S. at 537. The lone dissent thus agreed with United Allergy that the unions were analogous to the "victim of an *intentional*

tort" and so could sue without any inquiry into proximate causation. *Id.* at 548 (Marshall, J., dissenting). But the Court rejected this conclusion, holding that this specific-intent allegation was not a "panacea that will enable any complaint to withstand a motion to dismiss." *Id.* at 537 (majority opinion). When discussing proximate causation in other contexts, the Court has reached the same result. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010). So a competitor harmed by a defendant's refusal to pay taxes could not sue even though the defendant acted with the specific intent to gain an advantage over (and take sales from) the competitor. *See Anza*, 547 U.S. at 455–58; *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 560–61 (6th. Cir. 2022).

This rule makes sense. Suppose that the primary-care physicians had hired technicians as employees rather than obtain independent-contractor technicians from United Allergy. If the employee technicians claimed that they lost their jobs because the defendants intentionally targeted them with their anticompetitive conduct, could they sue over their lost wages? No, because of the "speculative" nature of their damages and the risk of "unduly complex litigation" in trying to figure out the harms passed on to these indirect employees. *See Adams*, 828 F.2d at 30–31. The rule should not be different simply because the physicians relied on independent contractors rather than employees for the same technician services.

*Fourth*, United Allergy analogizes its claims to those in three cases that did not trigger *Illinois Brick*. But none of these cases involved an indirect seller seeking to recover for harms inflicted on a direct seller and passed down a distribution chain. Start with the Supreme Court's *McCready* decision. There, an insurer conspired with a psychiatric-services association to harm psychologists by broadly covering psychiatry—but not psychology—services. *See McCready*, 457 U.S. at 468. A patient who opted to see a psychologist despite the lack of coverage paid for the services out of pocket and sought to recoup this payment from the insurer and psychiatric-services association. *See id.* at 468–69. The Court held that the patient could sue. *See id.* at 473–84. It reasoned that the patient did not seek money for injuries flowing "along a chain of distribution" that arose "from a single transaction" up the chain. *Id.* at 475. To the contrary, the insurer in *McCready* resembled the retailer in *Apple*: it acted as an "intermediary" between medical providers on the one side and patients (and their employers) on the other. *Apple*, 587

U.S. at 287. When an insurer acts anticompetitively, parties on both sides of the insurer (just like upstream suppliers and downstream consumers on both sides of a retailer) can sue to recover their distinct damages. *See id.* But *McCready*'s holding does not matter here because United Allergy sits one step removed from the primary-care physicians on the *same supply side* of the insurers. United Allergy thus would be analogous to a (fictional) medical supplier that sold services to the psychologists in *McCready* to help them serve patients. But nothing in *McCready* suggests that this type of indirect seller could sue in addition to the psychologists themselves (the directly harmed sellers).

United Allergy fares no better with its reliance on *Potters Medical Center v. City Hospital Association*, 800 F.2d 568 (6th Cir. 1986). There, the bigger hospital in a city refused to grant staff privileges to doctors who held privileges at the city's smaller hospital. *See id.* at 571. We concluded that the smaller hospital could sue the bigger one over this exclusive dealing. *See id.* at 575–76. Yet *Potters* involved a suit between two competitors who sat at the same level in the market. The hospitals *directly* contracted with physicians in the physician-labor market, and the exclusive-dealing restraint reduced the supply of labor for the smaller hospital. *See id.* at 575. We thus viewed that hospital as a "direct victim" of the restraint. *Id.* at 576. This case might resemble *Potters* if the Center had restrained the upstream market for *technician* labor—say, by adopting an exclusive-dealing arrangement that barred its technicians from working for competitors. But United Allergy makes no such claim. Rather, it says that the Center convinced insurers to engage in price fixing and a boycott in the downstream market for allergy testing and immunotherapy. The restraints in that market directly harmed the primary-care physicians and indirectly harmed upstream actors with whom the physicians contracted, such as United Allergy. So this case (unlike *Potters*) involves an upstream plaintiff indirectly injured by a downstream restraint that affected "different levels of a distribution chain[.]" *Apple*, 587 U.S. at 287.

United Allergy's citation to *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983) (Friendly, J.), fails for the same reason. That case concerned the market for cable-television programs. *See id.* at 291. Producers had been selling these programs to the two monopolist intermediaries (HBO and Showtime), which had been reselling them

downstream to local cable-television operators. *See id.* The antitrust plaintiff—a competing intermediary—sought to hold a tradeshow that would bring together program producers and cable-television operators outside the HBO and Showtime bottleneck. *See id.* When HBO and Showtime learned of this tradeshow, they discouraged program producers and cable-television operators from attending. *See id.* The court held that *Illinois Brick* did not bar the plaintiff from suing HBO and Showtime for the harms that they caused its tradeshow. *See id.* at 293–94. The plaintiff competed with HBO and Showtime; it did not buy programming from them or sell it to them. Its tradeshow harms thus differed from the monopsony undercharge and monopoly overcharge that the program producers and cable-television operators paid. *See id.* at 293–94. *Crimpers* would resemble this case if a competing insurer (at the intermediary level) sued Amerigroup and the other insurers for hindering its efforts to enter the market and break up their price fixing and boycott. This hypothetical insurer likely could sue because its injuries would differ from those of the primary-care physicians and patients. But United Allergy resembles a supplier to the program producers, one that seeks to recover for harms that those producers passed along as a result of HBO's and Showtime's anticompetitive conduct. That type of suit falls within *Illinois Brick*, not *Crimpers*.

*Fifth*, and finally, United Allergy falls back on policy arguments. *See* Appellant's Supp. Br. 13. It claims to be a better plaintiff than the primary-care physicians because it suffered a single large injury while the physicians suffered smaller, dispersed injuries. And it says the physicians may have a disincentive to enforce the antitrust laws because their livelihood depends on obtaining reimbursement from the very insurance companies that they would have to sue. Yet, as the complaint notes, these concerns have not prevented at least one other physician (Dr. Sewell) from suing over the same conduct. Compl., R.103, PageID 2695. Nor is it obvious that United Allergy's "lost profits" (rather than undercharge damages) represent the proper antitrust remedy because these sorts of profits "get lost primarily from hard competition or from the elimination of monopoly"—not from anticompetitive conduct. Easterbrook, *supra*, 55 Antitrust L.J. at 100; *see Howard Hess*, 424 F.3d at 375. All the same, we find the competing sets of *policy* arguments beside the point. The arguments cannot overcome the *legal* problem with this suit: United Allergy is "two . . . steps removed from" the insurers in the "distribution chain" for

allergy testing and immunotherapy services. *Apple*, 587 U.S. at 279. It thus "may not sue" under *Illinois Brick*. *Id.*

### III. State Tort Claims

United Allergy also argues that the district court wrongly granted summary judgment to the Center and Amerigroup on its three state-law claims. We will consider each claim in turn.

### A. Tortious Interference with Existing Contracts

Tennessee common law and statutory law both prohibit defendants from intentionally inducing a third party to breach its contract with a plaintiff. *See* Tenn. Code Ann. § 47-50-109; *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994). Under either law, this tort has the same seven elements. *See Edwards v. Travelers Ins. of Hartford*, 563 F.2d 105, 120 (6th Cir. 1977); *Givens v. Mullikin ex rel. Est. of McElwaney*, 75 S.W.3d 383, 405 (Tenn. 2002). The plaintiff must have entered a valid contract with a third party. *See Givens*, 75 S.W.3d at 405. The defendant must have known of this contract. *See id.* The defendant must have intended to induce the third party to breach the contract. *See id.* When engaging in its tortious actions, the defendant must have harbored "malice" toward the plaintiff. *See id.* The third party must have breached the contract. *See id.* The defendant's actions must have proximately caused that breach. *See id.* And the breach must have injured the plaintiff. *See id.*

Here, United Allergy alleges that the Center and Amerigroup induced primary-care physicians to breach their contracts with it. On appeal, the Center and Amerigroup do not dispute most of the elements of this tortious-interference claim. They concede that United Allergy formed valid contracts with primary-care physicians and that they knew of these contracts. In the district court, the Center and Amerigroup did argue that United Allergy failed to show that the physicians breached the contracts. But a United Allergy officer testified that 60 contracting clinics had "at some point in time" made at least one "late payment" to United Allergy in violation of their contract's payment terms. McMahon Decl., R.299-12, PageID 16951. The district court held that this testimony created a genuine dispute over the "breach" element, and the Center and Amerigroup do not challenge this conclusion on appeal. *See United Biologics*, 2024 WL 770640, at *12. Next, we find it debatable whether the Center and

Amerigroup knew of the contractual provision requiring physicians to timely pay United Allergy, and some caselaw suggests that defendants cannot intend "to induce" a breach of a contractual "duty" that they do not know about. *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987). But we need not consider this issue. The Center and Amerigroup do not dispute that enough evidence existed to suggest that they intended to cause the late-payment breaches (and that the breaches harmed United Allergy).

These concessions leave the "malice" and "proximate causation" requirements. United Allergy's claims against the Center and Amerigroup collapse at one or the other of these elements. The company has failed to present enough evidence that Amerigroup *maliciously* caused any of the identified breaches or that the Center *proximately* caused them.

1. *Amerigroup*. To prove that Amerigroup tortiously interfered with United Allergy's contracts with the 60 physician clinics, United Allergy must show that Amerigroup acted with "malice." *See Cambio Health Sols., LLC v. Reardon*, 234 F. App'x 331, 336–37 (6th Cir. 2007). Like the Restatement of Torts, Tennessee courts have held that "malice" does not require a defendant to have "ill will" toward a plaintiff. *Crye-Leike Realtors, Inc. v. WDM, Inc.*, 1998 WL 651623, at *6 (Tenn. Ct. App. Sept. 24, 1998); *Riggs v. Royal Beauty Supply, Inc.*, 879 S.W.2d 848, 851 (Tenn. Ct. App. 1994); Restatement (Second) of Torts § 766 cmt. s (A.L.I. 1979). Rather, these courts have concluded that a defendant need only commit a "wil[l]ful violation of a known right"—a phrase that requires the defendant to have acted "without legal justification." *Crye-Leike Realtors*, 1998 WL 651623, at *6 (citation omitted); *see Riggs*, 879 S.W.2d at 851.

A pair of cases about noncompete agreements show both that a legally defensible position cannot establish malice and that a legally indefensible position can. *Compare HCTec Partners, LLC v. Crawford*, 676 S.W.3d 619, 642–43 (Tenn. Ct. App. 2022), *with Riggs*, 879 S.W.2d at 851–52. In *Riggs*, an employee plaintiff signed a noncompete agreement with the defendant but switched jobs to work for a new employer. *See* 879 S.W.2d at 849. The defendant sent a letter to this new employer disclosing the noncompete agreement, which caused the new employer to fire the employee. *See id.* The employee claimed that the defendant had wrongly induced the new employer to breach its contract with him because the defendant should have

known that state courts would not enforce the noncompete agreement. *See id.* But the state court held that the defendant had not acted maliciously because it "would have been justified in litigating" the validity of the noncompete agreement even if a court would not have enforced it. *See id.* at 851–52. In *HCTec Partners*, by contrast, a business plaintiff sued a competitor for convincing an employee to quit and work for the competitor. *See* 676 S.W.3d at 625–26. This time, the state court held that the plaintiff had established malice. *See id.* at 642. It reasoned that the competitor had known of the noncompete agreement's validity and convinced the employee to violate the agreement anyway based on the mere hope that the plaintiff "would not bother to sue" over it. *Id.* at 642–43.

Amerigroup looks more like the defendant in *Riggs* than the one in *HCTec Partners*. To start, the insurer did not act with malice because it investigated the primary-care physicians (and denied their claims) "to protect a third person toward whom [it stood] in a relation of responsibility": TennCare. *Mefford v. City of Dupontonia*, 354 S.W.2d 823, 827 (Tenn. Ct. App. 1961) (quoting William L. Prosser, *Handbook of the Law of Torts* 736–37 (2d ed. 1955)). As one of three managed-care organizations that contract with TennCare to operate Tennessee's Medicaid program, Amerigroup has promised to protect public funds against fraud and waste. So its contract with TennCare requires it to adopt "utilization control programs and procedures" that "safeguard the Medicaid funds against unnecessary or inappropriate use of Medicaid services and against improper payments." Contract, R.275-3, PageID 10471; *see* 42 C.F.R. § 438.608(a). And Amerigroup must "cooperate" with state and federal agencies that investigate fraud. Contract, R.275-3, PageID 10472. Amerigroup also must notify TennCare of "suspected fraud cases" and generally undertake a "preliminary investigation" of the fraud. *Id.*, PageID 10472–73.

Amerigroup's actions against the physicians sprang from these duties. Indeed, TennCare *itself* repeatedly raised concerns with allergy-care billing. Its concerns arose as early as 2015 before Ameriprise even knew of United Allergy's existence. Mem., R.275-1, PageID 10144–50. At that time, TennCare "recommend[ed]" "a benefit limitation for allergen immunotherapy" to help its budget. *Id.*, PageID 10144. This recommendation followed from an allergy-care investigation showing (among other things) that physicians "billed" an "[e]xcessive number of

units" and that "[t]he person/facility preparing the antigen . . . [was] not the provider/facility who billed and received payment for the service." *Id.*, PageID 10145. The next year, the Tennessee legislature limited immunotherapy billing to no more "than a three month supply at a time." Mem., R.275-5, PageID 10796. And TennCare ultimately asked its managed-care organizations to "meet to discuss . . . a unified reimbursement policy concerning allergy immunotherapy." Email, R.275-10, PageID 11507. After these discussions, TennCare "decided to implement" uniform billing for the immunotherapy that patients administered at home. Email, R.275-10, PageID 11587.

By investigating physicians, Amerigroup simply responded to the concerns of its principal: TennCare. It, for example, audited the allergy-care billings of Dr. Sewell (the primary-care physician who sued) because of a *referral* from TennCare. Taylor Dep., R.275-10, PageID 11581–82. And it learned of Sewell's affiliation with United Allergy only through that audit. *Id.*

Amerigroup also had "legal justification" to investigate (and deny the claims of) the primary-care physicians who contracted with United Allergy. *HCTec Partners*, 676 S.W.3d at 642 (citation omitted). Amerigroup implements TennCare by contracting with physicians to provide services to eligible patients. Contract, R.275-14, PageID 12136. Under these contracts, physicians agree that they and their "employees shall perform all the services required hereunder directly and not pursuant to any subcontract between [them] and any other person or entity[.]" *Id.*, PageID 12152. They also agree that Amerigroup could "deny payment" if the medical "services" were not "provided in accordance with this Agreement." *Id.*, PageID 12148. Interpreting these provisions, Amerigroup concluded that it could deny the physicians' claims because United Allergy's contracts with them qualified as improper subcontracts. Email, R.299-6, PageID 16043. One of TennCare's own agents even flagged this subcontractor issue for Amerigroup's "investigation" of United Allergy "and other providers." Email, R.275-15, PageID 12350. Like the employer in *Riggs*, then, Amerigroup was "justified in litigating" the issue, and it did not act with malice merely by asserting a reasonable legal position. 879 S.W.2d at 852. The contrary rule

would turn every disputed legal or contractual question into a potential tortious-interference claim.

United Allergy's responses do not change things. It first points to a 2018 email from an Amerigroup employee that compiled allergy-care payment data after Amerigroup "opened all of the cases on" United Allergy. Email, R.299-5, PageID 15972. This data showed a significant drop in payments between 2015 and 2017. *Id.*, PageID 15971–72. That said, the employee explained that Amerigroup had not "completely flushed [United Allergy] out of Tennessee" because it had investigated only the top billers and a lot of "little clinics" might still have contracts with United Allergy. *Id.*, PageID 15971. United Allergy suggests that this language (about flushing out United Allergy) shows malice. Yet Amerigroup took the legal position that the physicians' contracts with Amerigroup barred them from using United Allergy to perform allergy-care services without preapproval. So Amerigroup did not believe that United Allergy possessed any "right" to contract with physicians. *HCTec Partners*, 676 S.W.3d at 642 (citation omitted). And if it did not, Amerigroup had full authority to deny claims to physicians who contracted with United Allergy.

United Allergy next cites workgroup notes suggesting that Amerigroup did not *subjectively* believe that United Allergy's relationship with physicians violated the subcontract rule. One stray statement in these notes provides: "Not considered a subcontracted service." Notes, R.299-6, PageID 16037. This unexplained statement does not create a genuine issue of material fact about Amerigroup's beliefs. Indeed, the notes elsewhere state that "[p]rovider is in contract violation" on the ground that "[s]ubcontracts must be pre-approved[.]" *Id.* And overwhelming evidence otherwise shows that Amerigroup had concluded that United Allergy's contracts with physicians qualified as a "material breach" of the subcontractor provision in Amerigroup's own contracts with those physicians. Audit, R.299-1, PageID 15590.

United Allergy counters that Amerigroup still acted with malice because it *unreasonably* held this belief. Its evidence? A 2017 letter from TennCare allegedly told Amerigroup that "the subcontract issue had been resolved and that no enforcement action was intended against" United Allergy. Appellant's Br. 49. But United Allergy misrepresents this letter—which concerned

Amerigroup's decision to refer Dr. Sewell's potential fraud to TennCare. Amerigroup's contract with TennCare did not permit it to seek to recoup funds from providers while they were "being investigated" by TennCare. Contract, R.275-3, PageID 10471–72. In the letter, TennCare said it was "returning the above case back to" Amerigroup, that Amerigroup should "proceed forward with action as [it] deem[ed] necessary," and that it should let TennCare know if it sought to recoup funds. Letter, R.299-6, PageID 16042. So Amerigroup read the letter as allowing it "to move forward" against Sewell. Email, R.299-6, PageID 16041. And no jury could read the letter (as United Allergy does) to suggest that TennCare approved Sewell's contract with United Allergy.

United Allergy also points to a state-court decision that allegedly "rejected" Amerigroup's conclusion that Dr. Sewell had entered an improper subcontract with United Allergy. Reply Br. 23. Not so. The state court found a dispute of fact that required a jury trial on this question. Order, R.352-43, PageID 20886–87. If anything, then, this order proves Amerigroup's point. Even if it mistakenly interpreted the subcontract provision, the disputed fact question shows Amerigroup was at least "justified in litigating" the issue. *Riggs*, 879 S.W.2d at 852. In sum, Amerigroup did not act with malice as a matter of law because it had a "legal justification" for its conduct. *Crye-Leike Realtors*, 1998 WL 651623, at *6.

2. *The Center*. We need not consider the Center's alleged "malice" because United Allergy's claim against it fails on causation grounds. To prove tortious interference, United Allergy must show that actions attributable to the Center caused the 60 physician clinics to breach their contracts. *See Givens*, 75 S.W.3d at 405. In common-law tort suits, the Tennessee Supreme Court has required a plaintiff to prove that the defendant's conduct "was both the cause-in-fact and the legal cause" of the plaintiff's injury. *Cotten v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019); *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005). To satisfy the cause-in-fact requirement, plaintiffs must prove but-for causation. *See Cotten*, 576 S.W.3d at 638; *King v. Andersen County*, 419 S.W.3d 232, 246 (Tenn. 2013). That is, they must show that they would not have suffered their injuries "but for" the defendant's conduct. *Jenkins v. Big City Remodeling*, 515 S.W.3d 843, 852 (Tenn. 2017). To satisfy the legal-cause requirement, plaintiffs must establish proximate causation. *See Cotten*, 576 S.W.3d at 638. The Tennessee

Supreme Court has interpreted "proximate causation" to include three primary requirements. *See id.* The defendant's conduct must have been a "substantial factor" in the plaintiff's injury. *Id.* (citation omitted). A decision to hold the defendant liable for this conduct must not conflict with any "rule or policy" that would relieve the defendant of liability. *Id.* (citation omitted). And a reasonable person must have been able to foresee that the plaintiff's injury would arise from the defendant's actions. *See id.*

United Allergy cannot establish causation against the Center because any reasonable jury would reach the same conclusion on this summary-judgment record: that the Center's actions were not "substantial factors" in bringing about the claimed contract breaches. *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 772 (Tenn. 2006); *see Shouse v. Otis*, 448 S.W.2d 673, 677 (Tenn. 1969). To prove this causation, United Allergy relies on a multistep chain of events. The Center's agents (most notably, DeLozier) allegedly lobbied Amerigroup and other insurers to investigate primary-care physicians who offered allergy-care services. This lobbying allegedly led Amerigroup and the other insurers to audit the physicians. The audits, in turn, caused Amerigroup and the other insurers to deny the physicians' claims and to seek recoupment for paid claims. Finally, the lack of reimbursement (plus the increased scrutiny) from Amerigroup and the other insurers caused all 60 clinics to miss payments of the fees they owed United Allergy.

This chain of events likely would not have allowed a reasonable jury to find that the Center qualified as a but-for cause of the alleged breaches—let alone a substantial factor in bringing them about. Most notably, the evidence shows that TennCare and Amerigroup had *independent* concerns with excessive allergy-care billing by primary-care physicians separate from anything the Center said. United Allergy, for example, identifies no evidence to suggest that the Center (or DeLozier) caused TennCare to conduct its 2015 investigation into allergy-care billing or to make its recommendations to reduce the reimbursement for this care because of physician abuses. Mem., R.275-1, PageID 10144–50. Likewise, no evidence suggests that the Center even knew of (let alone identified) the subcontract issue on which Amerigroup primarily relied to deny the claims of physicians. *See United Biologics*, 2024 WL 770640, at *13 n.15. So how could the Center have caused any of these subcontract-based denials? More generally,

United Allergy does not identify evidence that the Center successfully convinced an insurer to audit even a single primary-care physician. It instead relies on the Center's *generic* lobbying efforts. But we find it too "speculative" to connect those generic efforts all the way through to any specific late payment by any specific physician. *Naifeh*, 204 S.W.3d at 772.

United Allergy has both factual and legal responses. Factually, it relies on an email chain from 2015 among the Center's "marketing managers," including DeLozier. Appellant's Br. 41. In this chain, DeLozier bemoaned that United Allergy's model encouraged physicians "to test everyone" for allergies even though only about a third of patients need testing. Email, R.352-11, PageID 20623. DeLozier also claimed that he had "many examples" of primary-care physicians misdiagnosing nonallergic patients with allergies. *Id.* He suggested that the Center should encourage insurers like Amerigroup to conduct "medical necessity audits" of primary-care physicians because he believed the physicians would flunk these audits, which would "cut [United Allergy] out of [the] pic[.]" *Id.* United Allergy also cites emails and notes from DeLozier's meetings with insurers that discussed these topics. *See, e.g.*, Notes, R.299-5, PageID 15930; Email, R.299-6, PageID 16165; Mahler Dep., R.299-14, PageID 17244–53. Yet United Allergy does not connect this evidence through the chain of causation that it hypothesizes. In other words, it identifies no evidence that the Center successfully lobbied an insurer to perform a medical-necessity audit of any physician that the insurer "would not have" otherwise audited *on its own initiative*. *Jenkins*, 515 S.W.3d at 852. And it identifies no evidence that DeLozier's actions led any insurer to wrongly deny payments that the insurer "would not have" otherwise denied. *Id.*

United Allergy also points to evidence that the Center tried to discourage a physician (Dr. Christopher Climaco) from contracting with United Allergy in 2015. Appellant's Br. 12, 43; Email, R.292-5, PageID 15911–15. Yet Climaco ended up contracting with United Allergy anyway. And this *pre-contract* evidence about events in 2015 does nothing to show that the Center somehow caused Climaco's clinic (Putnam County Pediatrics) to breach its contract with United Allergy some five years later in 2020. McMahon Decl., R.299-12, PageID 16958.

Legally, United Allergy notes that proximate causation does not require a party to "be the *sole* cause" of a plaintiff's injury. *Hale*, 166 S.W.3d at 718. True enough. But it does require the party to be "*a* cause." *Id.* And United Allergy's evidence would not permit a reasonable person to find that the Center caused any primary-care physician to pay any invoice late. *See Naifeh*, 204 S.W.3d at 772. That "fatal flaw" dooms its claim. *Jenkins*, 515 S.W.3d at 853.

### B. Tortious Interference with Business Relations

Tennessee courts also recognize the separate tort of intentional interference with business relationships. *See Trau-Med of Am., Inc. v. Allstate Ins.*, 71 S.W.3d 691, 701 (Tenn. 2002). Yet this tort has a "confined scope." *BNA Assocs. LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 63 F.4th 1061, 1064 (6th Cir. 2023). Unlike a tortious-interference claim (which requires a breach of contract), this tort covers both early business relationships that have yet to blossom into binding contracts and continuing at-will relationships that will never produce binding long-term commitments. *See id.* To prove this distinct claim, a plaintiff must show five things. *See Trau-Med*, 71 S.W.3d at 701. The plaintiff must have had either an "existing business relationship with specific third parties" or a "prospective" business "relationship" "with an identifiable class of third persons[.]" *Id.* The defendant must have known of this relationship. *Id.* The defendant must have acted with an intent to cause the relationship to end. *Id.* The defendant must have harbored an "*improper motive*" or used "*improper means*" to end the relationship. *Id.* And the plaintiff must have suffered an injury "resulting from" the defendant's interfering actions. *Id.*

Amerigroup asserts that this claim fails at the outset because United Allergy did not present evidence to establish the required prospective relationship with an "identifiable class" of physicians. United Allergy could not pursue this claim for breaches of *existing* contracts with physicians. *See BNA Assocs.*, 63 F.4th at 1064. So it had to point to an "identifiable class" of physicians with whom it had a "prospective" (that is, *expected*) contractual relationship at the time of the interference. *Trau-Med*, 71 S.W.3d at 701. And United Allergy does not dispute the district court's conclusion that it cannot list *every* physician in Tennessee as its "identifiable class" of potential contract partners. *See United Biologics*, 2024 WL 770640, at *17.

United Allergy instead claims it had an expected relationship with all physicians whom it had "attempted to contract with" in some way in the past, whether by visiting their office or by handing them a business card at a tradeshow. McMahon Dep., R.275-12, PageID 11836–37. And it produced a spreadsheet that listed all these physicians. Does this spreadsheet satisfy the "identifiable class" requirement? *Trau-Med*, 71 S.W.3d at 701. We think not. The Tennessee courts have not provided much guidance on this element. When recognizing the tort claim, though, the Tennessee Supreme Court broadly examined caselaw from other jurisdictions. *See id.* at 699–701. And this caselaw typically requires plaintiffs to establish with "close certainty" that they would have entered the contractual relationship, so a "mere hope of a contract" falls short. *United Educ. Distribs., LLC v. Educ. Testing Serv.*, 564 S.E.2d 324, 329–30 (S.C. Ct. App. 2002) (citing cases); *see Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388 P.3d 800, 807–08 (Cal. 2017); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 221–22 & n.10 (Minn. 2014); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814–15 (Fla. 1994). The notion that United Allergy had a prospective contractual relationship with a physician merely because a United Allergy salesperson had stopped by the physician's office at some point in the past strikes us as too "speculative" to support this tort. *United Educ. Distribs.*, 564 S.E.2d at 330.

That said, the district court found this element met based on a narrower class: the physicians with whom United Allergy had contracted in the past. *See United Biologics*, 2024 WL 770640, at *17. We find this claim debatable because some state courts have held that "[t]he mere hope that some of [a plaintiff's] past customers may choose to buy again cannot be the basis for a tortious interference claim." *Ethan Allen*, 647 So.2d at 815. On the other hand, Tennessee courts have suggested that an identifiable class can exist for those with whom plaintiffs have an *existing* contractual relationship (say, currently contracted physicians) if the plaintiffs allege interference with "future contractual relationship" between these parties. *Clear Water Partners, LLC v. Benson*, 2017 WL 376391, at *7 (Tenn. Ct. App. Jan. 26, 2017). And the Restatement suggests that the tort might reach interference with "a contract terminable at will" (like United Allergy's contracts with physicians) if the defendant's interference causes the

third party to end the at-will contract (without breaching it). Restatement (Second) of Torts § 766B cmt. c.

To avoid these debates, we will assume that the physicians with whom United Allergy had previously contracted and those with whom it had an ongoing at-will relationship could qualify as the identifiable class. The problem for United Allergy? Once we identify the class in this way, its claims fail for the same reasons that its tortious-interference-with-contract claims fail: partially on motive grounds (as to Amerigroup) and partially on causation grounds (as to the Center).

1. *Amerigroup.* United Allergy has not shown that Amerigroup acted with an "*improper motive*" or used "*improper means*" for the same reasons that it failed to show Amerigroup's malice. *Trau-Med*, 71 S.W.3d at 701. This result follows from the reality that this tort provides *less* protection to business relationships than the protection provided by the tort that bars a party from intentionally inducing a breach of contract. *See Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 177 (Tenn. Ct. App. 2007). One party's efforts to take customers from another party is the essence of a free market, so courts have refused to interpret the tort in a way that would "prohibit or undermine [a party's] ability to contract freely and engage in competition." *BNA Assocs.*, 63 F.4th at 1065 (citation omitted). To establish the defendant's improper motive, then, a plaintiff must show that the defendant acted with the "predominant purpose" of injuring the plaintiff. *Trau-Med*, 71 S.W.3d at 701 n.5. And to establish the defendant's use of "improper means," the plaintiff must show things like the violation of existing laws or distinct torts. *See id.*

As we have said, however, Amerigroup did not act with an improper motive because it investigated the physicians with whom United Allergy had contracted "to protect" TennCare and its public funds. *Mefford*, 354 S.W.2d at 827 (citation omitted). And Amerigroup did not use improper means because its reasonable interpretation of its contracts with those physicians "justified" the complained-of investigations. *Riggs*, 879 S.W.2d at 852.

2. *The Center.* Likewise, United Allergy has not shown that the Center caused physicians to terminate (or refuse to renew) their at-will contracts with United Allergy for the

same reason that it has not shown that the Center caused the physicians to breach those contracts. To prove this tort, United Allergy must show that the claimed harms "result[ed] from" improper actions attributable to the Center. *Trau-Med*, 71 S.W.3d at 701. We read this language as incorporating the same cause-in-fact and legal-cause requirements that the Tennessee courts impose in common-law tort suits. *See Cotten*, 576 S.W.3d at 638. And United Allergy points us to no evidence to suggest that the Center's actions were a but-for cause (let alone a substantial factor) in any physician's decision to terminate a contract or refuse to renew one. *See id.*

## C. Civil Conspiracy

This conclusion leaves United Allergy's civil-conspiracy claim. To establish a conspiracy, a plaintiff must prove that at least two actors shared a "common scheme" to carry out either an "unlawful" goal or a lawful goal using "unlawful means" and that the agreed-on actions injured the plaintiff. *Trau-Med*, 71 S.W.3d at 703. Yet this type of claim does not qualify as a standalone tort. *See Watson's Carpet*, 247 S.W.3d at 186. Rather, it qualifies as a method to hold one conspirator liable for the actions of the others on vicarious-liability grounds. *See Trau-Med*, 71 S.W.3d at 703. So a conspiracy to complete a lawful act in a lawful way does not create any liability. *See Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994). And plaintiffs must establish that the conspirators completed a "predicate tort" to hold them liable. *Watson's Carpet*, 247 S.W.3d at 186. The district court held that United Allergy's civil-conspiracy claim failed on this ground because it did not establish that Amerigroup or the Center committed a tort against it. *See United Biologics*, 2024 WL 770640, at *19. As far as we can tell, United Allergy does not dispute that court's conclusion that its conspiracy claim necessarily fails if its tortious-interference claims cannot survive. *See* Appellant's Br. 54–58. We thus find any contrary reasoning forfeited. *See Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 884 (6th Cir. 2024).

United Allergy instead argues that the district court overlooked its claim that the two Blue Cross entities joined the conspiracy. If these Blue Cross entities committed torts against United Allergy as part of a conspiracy, the conspiracy allegations would allow United Allergy to hold Amerigroup and the Center liable for those torts. *See Trau-Med*, 71 S.W.3d at 703. United Allergy is correct as a matter of law. But it is incorrect as a matter of fact. United Allergy's

appellate briefing does not elsewhere adequately explain why the conduct of these BlueCross entities met all the required elements of its two tortious-interference claims. So it forfeited these claims too. *See Wilgar Land Co. v. Dir., Off. of Workers' Comp.*, 85 F.4th 828, 842 (6th Cir. 2023).

We affirm.

—————————————

**CONCURRENCE**

—————————————

KETHLEDGE, Circuit Judge, concurring.   I join the court's opinion, which offers a careful synthesis of the relevant Supreme Court caselaw.   For the reasons that Judge Murphy so ably explains, I agree that the existing caselaw directs—albeit by analogy—the outcome that we reach here.   So far as I can tell, however, that result serves to harm consumer welfare rather than advance it.

United Allergy's complaint plausibly alleges that, before 2013, the market for allergen-immunotherapy services in Tennessee was woefully undersupplied.   Many patients in need of those services did without; others drove long distances to receive them at the defendant Center, which dominated the market and faced little competition.   But the price signal did its work:  in 2013 United Allergy entered this market with an innovative package of services that enabled primary-care physicians to provide allergen-immunotherapy services directly to their patients.   As a result—with this new supplier—rates came down, access to these services became more convenient, and more patients actually obtained them.   But that created new competition for the Center, and more claims for the defendant insurers to pay (on a flat-fee contract with TennCare, no less).   And so, the complaint alleges in detail, the Center and the insurers coordinated a response—in which the insurers proceeded to audit, hassle, and otherwise deny payment to physicians who had contracted with United Allergy to provide these services to patients in Tennessee.   That kind of campaign is what Judge Bork called a "disguised naked boycott"—disguised, because it cloaks the refusal to deal in the exercise of some regulatory power (here, the insurers' power to review claims for payment).   Robert H. Bork, *The Antitrust Paradox* 335–37 (1978).   And the result of that boycott, eventually, was the departure of United Allergy from this market and a return to the former, undesirable status quo.

Thus, the complaint plausibly alleges, these defendants successfully conspired to eject a new and more efficient supplier from a market that had been badly undersupplied before. True—as a matter of strict, mechanical causation—the insurers' boycott affected the physicians

directly, and United Allergy indirectly. Unlike the harm to a second-hand buyer in *Illinois Brick*, however, the damage to United Allergy was not collateral. Quite the contrary: the ejection of United Allergy from this market was the very object of the defendants' scheme. The harms for which United Allergy seeks redress were harms that the defendants specifically intended. The parties that suffered collateral damage, rather, were the patients—who must again travel farther and pay more for services at the Center, or go without treatment at all.

The goal of antitrust law is to advance consumer welfare. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221 (1993); *ProMedica Health System, Inc. v. F.T.C.*, 749 F.3d 559, 571 (6th Cir. 2014); 2B Areeda ¶ 100 at 4 ("the principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively"); *cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription'") (quoting Bork, *The Antitrust Paradox* 66 (1978)). I appreciate the Supreme Court's concerns about allowing parties harmed indirectly to bring antitrust claims. And legal rules must be general, rather than crafted to reach an outcome in a particular case. But the Court's concerns must be strong indeed, I suggest, to leave without a remedy the pattern of conduct alleged here.